Argued and submitted December 4, 1990, Court of Appeals reversed in part and affirmed in part; case remanded to circuit court for further proceedings December 17, 1992, reconsideration denied January 26, 1993

Byron W. HAWKINS
and Jean Hawkins,
husband and wife,
*Petitioners on Review, Respondents on Review,*

*v.*

CITY OF LA GRANDE,
a municipal corporation,
*Respondent on Review, Petitioner on Review.*

(CC 86-11-30872; CA A47064 (Control); SC S37410)

Fred D. WALLENDER
and Sharon K. Wallender,
husband and wife,
*Petitioners on Review, Respondents on Review,*

*v.*

CITY OF LA GRANDE,
a municipal corporation,
*Respondent on Review, Petitioner on Review.*

(CC 86-11-30873; CA A47065; SC S37418)
(Cases Consolidated)
843 P2d 400

58

W. Eugene Hallman, Pendleton, argued the cause for petitioners on review/respondents on review Hawkins and Wallender. With him on the petition was Mautz Hallman, Pendleton.

Mildred J. Carmack, Portland, argued the cause for respondent on review/petitioner on review City of La Grande. With her on the petition was Schwabe, Williamson & Wyatt.

Before Peterson, Chief Justice,** and Carson,*** Gillette, Van Hoomissen, Fadeley, and Unis, Justices.

FADELEY, J.

---

** Chief Justice at the time of argument.

*** Chief Justice at the time of decision.

## FADELEY, J.

In these consolidated cases, defendant City intentionally released sewage-laden water (hereafter, effluent) flooding onto the farms of plaintiffs, killing plaintiffs' livestock and growing crops, and causing other harm.

Normally, defendant treated its sewage and then pumped the effluent by pipe 5 miles to a river. But the present case arose when weather conditions increased the flow of storm drainage water into the city's sewers to such an extent that another pump, which the city did not have, would have been needed to pump the increased volume of effluent to the river. No action was taken for a week. During that time, additional effluent flowed into the city's sewer ponds where it remained.

City's employee who operated the sewer plant testified that he released the untreated effluent into a slough when the level of the city's sewer ponds rose to within three feet of the top of their banks. Testimony established that the volume of effluent released would have raised the pond levels one foot. Although there were no such winds, a Department of Environmental Quality employee testified that he discussed with a city employee the possibility that waves might breach the banks, if high winds did arise. No prior warning was given about the effluent release. The effluent killed growing crops and livestock at farms downstream along the slough.

Plaintiffs pleaded both inverse condemnation and tort theories for recovery. Plaintiffs requested attorney fees on the inverse condemnation theory under ORS 20.085.[1]

At the close of plaintiffs' cases-in-chief, city moved for directed verdicts on the inverse condemnation claims. The trial court ruled that "as a matter of law that a single instance of flooding is not * * * inverse condemnation. * * * It doesn't

---

[1] ORS 20.085 in part provides:

"In a proceeding brought under section 18, Article I * * * of the Oregon Constitution * * * if the owner * * * prevails, the owner * * * shall be entitled to * * * reasonable attorney fees at trial and on appeal."

Oregon Constitution, Article I, section 18, in part provides:

"Private property shall not be taken for public use * * * without just compensation; nor except in the case of the state, without such compensation first assessed and tendered * * *."

\* \* \* constitute a taking as distinguished from the infliction of damages." The Court of Appeals reversed, holding that the government action that killed livestock and growing crops was a condemnation of them, and remanded the inverse condemnation claims for loss of livestock and growing crops for further proceedings in the trial court. *Hawkins v. City of La Grande*, 102 Or App 502, 507-08, 795 P2d 556 (1990). We granted defendant's petition for review of that portion of the Court of Appeals' decision, which for the most part, we affirm.

At the close of all the evidence at the trial, city separately moved for a directed verdict or for "dismissal under ORS chapter 401, which provides absolute immunity for any actions taken by a city \* \* \* in the midst of an emergency or crisis situation \* \* \* [providing] specific statutory immunity under ORS chapter 401 for emergency situations like this."[2] The trial court ruled that there was no emergency and denied city's motion. That court also denied city's separate motion for directed verdict based on discretionary immunity.

The trial court submitted the tort claims to the jury whose verdict on them was for the plaintiffs in each case. Concerning the tort claims, the Court of Appeals reversed and instructed the trial court to vacate the judgments entered for plaintiffs on those verdicts, stating:

"We hold, as a matter of law, that defendant was immune from tort liability under ORS 401.515(1). The court erred in not granting a directed verdict." *Hawkins v. City of La Grande, supra*, 102 Or App at 505.

We granted plaintiffs' petition for review as to that portion of the Court of Appeals' decision and reverse it.

## IMMUNITY

City pleaded these separate affirmative defenses, among others:

"Any damage to plaintiffs' property was a result of an act of God and not caused by any act of defendant.

"\* \* \* \* \*

---

[2] Chapter 401 combines statutes on three separate, although related, subjects. Defendant did not cite the trial court to any specific section. Several sections of ORS chapter 401 might have been pertinent.

"Defendant is immune from liability to plaintiffs pursuant to ORS 30.265(c)(3)."

No elaboration of either of these defenses whatever was alleged. City did not plead any facts relating to an emergency defense, statutory or otherwise, and made no mention of ORS chapter 401, or any section of that chapter, in its pleadings.

### A. Emergency Act Immunity

Plaintiffs argue that an ORS Chapter 401 emergency defense is not available for each of the three following reasons:

(1)  Defendant did not plead it as an affirmative defense, although defendant affirmatively pleaded six other defenses.

(2)  The statute allows the emergency defense only where the city establishes an "emergency management agency," which defendant had not done.

(3)  The emergency immunity statute expressly provides that it does not excuse liability for intentional destruction of private property by any governmental agency.

■      Our disposition of plaintiffs' first argument makes it unnecessary to reach their remaining arguments. Because the claim of emergency agency immunity must have been pleaded as an affirmative defense, we hold that defendant was not entitled to assert it on appeal.[3]

The relevant pleading rules call for defenses to be pleaded. Oregon Rules of Civil Procedure (ORCP) 13 A provides:

"The pleadings are the written statements by the parties of the facts constituting their respective claims and defenses."

ORCP 19 B provides in part:

"In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and

---

[3] This is not a case where the parties and the court have tried the case as if a theory of recovery or defense had been pleaded even though it had not been.

award, assumption of risk * * * and any other matter constituting an avoidance or affirmative defense. * * *"

ORCP 21 A provides in part:

> "*Every* defense, *in law or fact*, to a claim for relief in any pleading, whether a complaint, counterclaim, cross-claim or third party claim, *shall be asserted* in the responsive pleading thereto * * *." (Emphasis added.)

According to ORCP 12 A, "[a]ll pleadings shall be liberally construed with a view of substantial justice between the parties," but some ultimate fact must be pleaded before there is anything to construe.[4] ORCP 19 B in part requires that "a party shall set forth affirmatively * * * any other matter constituting an avoidance or affirmative defense." This, city did not do.

■      However, ORCP 12 B provides a test for disregarding pleading defects, stating that: "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party." A substantial right is affected where the pleadings fail to allege facts that alert the court to and support the actual claims or defenses of an adverse party. Our cases have required pleadings of adequate facts. *Samuel v. Frohnmayer*, 308 Or 362, 369, 779 P2d 1028 (1989) ("If recovery of attorney fees is to be based on ORS 182.090, some notice in the form of pleaded facts will be necessary before a court can consider awarding them.").

A review of one section of ORS chapter 401, ORS 401.515, indicates that many different issues of fact and law may arise under that chapter as to whether immunity is available to a specific actor or a specific action.

Because of city's failure to plead immunity under ORS 401.515 as an affirmative defense, the record developed in this case provides no basis on which to identify the relevant

---

[4] ORCP 18 A requires "[a] plain and concise statement of the ultimate facts constituting a claim for relief," a fact-pleading requirement. The function of pleadings in an action, after the advent of the ORCPs as well as before, may be compared to a syllogism. The major premise is the law of the land. The allegations of the pleader correspond to the minor premise and must allege facts sufficient to bring the pleader within that law. These allegations must consist of facts on which the pleader relies to lead to the desired conclusion — the "therefore" ending of the syllogism which would justify the judgment or other relief sought.

legal or factual issues as to city's claim of immunity, let alone to resolve them, even though a full trial otherwise was held. City's failure to plead immunity under ORS 401.515 is fatal to its assertion of it as a defense. We turn to another potential source of statutory immunity.

## B. Discretionary Immunity Under ORS 30.265.

City contends that, in the event ORS chapter 401 "emergency" agency immunity is not available, then discretionary immunity under ORS 30.265(3)(c) prevents liability of city for the acts of its sewer plant operator that discharged its sewer-water on plaintiffs' lands.

ORS 30.265(1) in part provides:

"Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function or while operating a motor vehicle in a ridesharing arrangement authorized under ORS 276.598."

ORS 30.265(3) in part provides:

"Every public body and its officers, employees and agents acting within the scope of their employment or duties, * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

The fact that a decision is made, choosing between available alternatives, does not yet demonstrate that the type of discretion that is entitled to immunity has been exercised. *Lowrimore v. Dimmitt*, 310 Or 291, 296, 797 P2d 1027 (1990) (mere fact of a "choice among two or more courses of action" does not make the choice a "policy judgment" as is required before discretionary immunity will apply). In *Lowrimore*, this court explained that:

"A traffic officer's decision to pursue a vehicle such as the Dimmitt vehicle, though discretionary in the sense that it involves the exercise of judgment and choice by the officer, is not one that qualifies its maker to immunity under ORS 30.265(3)(c). The making of the decision to pursue does not

create any departmental policy and was not made by a person 'with governmental discretion.' *Little v. Wimmer*, [303 Or 580, 588, 739 P2d 564 (1987)]. Although the decision to pursue may have been made pursuant to a county departmental policy, the decision itself is not a policy judgment within the meaning of *McBride v. Magnuson*, [282 Or 433, 578 P2d 1259 (1978)] and *Stevenson v. State of Oregon*, [290 Or 3, 619 P2d 247 (1980)]." 310 Or at 296.

In *Stevenson v. State of Oregon, supra*, this court pointed out that "[t]he burden is on the state to establish its immunity." 290 Or at 15. In *Little v. Wimmer, supra*, plaintiff alleged negligence for failure to install signs that warned of a dangerous highway intersection and for failure to remedy the dangerous condition of that intersection. The case was brought by motorists who were injured in collisions at the dangerous intersection. This court reversed summary judgments grounded on discretionary immunity, stating:

"In the absence of evidence that the decision was made as a policy judgment by a person or body with governmental discretion, the decision is not immune from liability.

"As we said in *Miller v. Grants Pass Irrigation*, 297 Or 312, 320, 686 P2d 324 (1984), '[i]f there is a legal duty to protect the public by warning of a danger or by taking preventive measures, or both, the choice of means may be discretionary, but the decision whether or not to do so at all is, by definition, not discretionary.' " 303 Or at 588-89.

In cases decided before enactment of the Oregon Tort Claims Act, this court also denied governmental immunity in situations analogous to that present here. *See, e.g., Levene v. City of Salem*, 191 Or 182, 190-92, 196, 229 P2d 255 (1951) (holding that "periodic flooding" of plaintiffs' building by city's redirection of standing water to promote health of city inhabitants was ground for trespass liability from which governmental immunity did not protect); *Wilson v. City of Portland*, 153 Or 679, 686, 58 P2d 257 (1936) (answering negatively the question "[c]an it be that a city is acting for the public welfare when it dumps putrid and foul smelling garbage and refuse within 300 feet of a person's home, rendering it an unfit place in which to live?").

When the city's functionary made the specific decision to release untreated effluent into the slough, it did not create any future governmental or "departmental policy,"

*Lowrimore v. Dimmitt, supra*, 310 Or at 296, and was not a policy judgment entitling the city to discretionary immunity. As an aid to determining whether a given choice is one of policy, this court has also commented that "policy discretion is more likely to be found at or near the level of political responsibility." *McBride v. Magnuson, supra*, 282 Or at 438. City's functionary, charged with the duty of safe operation of the sewer plant and apprised of the unusually high volume of effluent being received at city's sewer ponds, initially did nothing either to reduce the inflow or to increase discharge of the effluent by the approved method. Later he decided to spill the untreated effluent into an adjacent flooded slough and thereby onto plaintiffs' properties without warning. The city has not demonstrated, as it must to prevail, that the act of releasing effluent was conduct for which the city was entitled to discretionary immunity.

## C. Common Law Immunity
## For Passing Water Through Impoundment.

City also contends that the trial court erred by refusing to instruct the jury that city was lawfully entitled to release from the impoundment in city's sewage treatment ponds the same volume of effluent as ran into them. Plaintiffs respond that city was not entitled to any instruction about releasing as much water from an impoundment as runs in because such a rule is limited to natural waterways, not to artificially collected effluent impoundments, and thus is not law applicable to this case. We agree; the rule invoked is limited to impoundments of naturally occurring runoff within a natural waterway. *Crawford v. Cobbs & Mitchell Co.*, 121 Or 628, 637-38, 253 P 3, 257 P 16 (1927) (upper riparian owner may release flood waters providing he does not swell the natural flow of the stream below the dam).

## INVERSE CONDEMNATION

As noted previously, the trial court did not permit plaintiffs' inverse condemnation theory or claim to reach the jury. The Court of Appeals agreed that no land was taken, but reversed the trial court as to "livestock and alfalfa and wheat" destroyed, and remanded the inverse condemnation claims to the trial court for further proceedings.

In this case, plaintiffs were awarded a judgment for damages for the livestock, alfalfa and wheat, in an amount set by a jury in the trial court. We have affirmed that judgment by holding that the impediments to it urged by city, including one upheld by the Court of Appeals, are not available or applicable in this case. However, affirming that judgment does not fully resolve the issues on this appeal. If there was a taking by inverse condemnation, plaintiffs are statutorily entitled not only to compensation for the taking, but also to reasonable attorney fees. ORS 20.085, *supra* at n 1.

Responding to plaintiffs' claim, city first contends that there can be no taking of the livestock and crops by a one-time flooding. Second, city argues that, inasmuch as no real property was taken, there can be no taking of the growing crops because, as a matter of law, city argues, they are part of the real property. We turn to those contentions of the city.

## A. Was There a Taking?

The facts of this case establish the claim of condemnation of the crops and livestock killed sufficiently to establish the claim on that theory. Restatement of Property (second), section 8.1, comment (d) at 263 (1977) in part provides:

> "Inverse condemnation is the name given to a cause of action against a governmental agency to recover the value of property which has been taken in fact by the governmental agency, even though there has been no formal exercise of the power of eminent domain. Successful litigation against the governmental agency is a factual determination that there has been a 'taking' and in effect forces the governmental agency to purchase the interest taken. The 'taking' in that case relates back to the date of the beginning of the governmental conduct that is determined to be a 'taking.' "

Our cases support application of that statement to the facts of this case. Personal property, such as the livestock and crops at issue here, can be taken; there is no requirement that the realty on which the personal property is located must be taken, too. *See Coos Bay Oyster Coop. v. Highway Com.*, 219 Or 588, 348 P2d 39 (1959) (oysters are personal property, and allegations that oysters were taken will support inverse condemnation action).

■   However, property is not "taken" if it is simply damaged. In *Moeller v. Multnomah County*, 218 Or 413, 425-27, 345 P2d 813 (1959), this court pointed out that Oregon's "takings" clause in Article I, section 18, of the Oregon constitution, does not include the word "damage" as well as the word "taken," as do many other jurisdictions where the constitutions provide for more liberal compensation. The court then approved as a definition of "taking" that required "destruction, restriction or interruption of the necessary use and enjoyment of [the] property" of a person for a public purpose. *Id.* at 431 (approving definition in *Morrison v. Clackamas County*, 141 Or 564, 568, 18 P2d 814 (1933)). Most cases boil this definition down to a test of whether there has been a "substantial" interference with property rights. *See Lincoln Loan v. State Hwy. Comm.*, 274 Or 49, 57, 545 P2d 105 (1976) (facts showing a "substantial interference by the state with the use and enjoyment of * * * property" state takings claim); *Thornburg v. Port of Portland*, 233 Or 178, 192, 376 P2d 100 (1962) (a taking occurs when the "government acts in such a way as substantially to deprive an owner of the useful possession of that which he owns"); *Moeller v. Multnomah County, supra*, 218 Or at 427 (Oregon cases on inverse condemnation involve "substantial taking or destroying," or deprivation of "a substantial part" of property).

■■   Defendant relies on *Barnes v. United States*, 538 F2d 865 (Ct Cl 1976), for the proposition that a single flooding of land, that does not threaten to recur, is not sufficient to state a real property taking claim.[5] However, in Oregon the test for inverse condemnation is not a counting of the number of interfering floods, but application of the substantial interference test, that is, whether there has been flooding that destroys or materially decreases the value of private property. *Cereghino v. State Highway Com.*, 230 Or 439, 443, 370 P2d 694 (1962); *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 248 P2d 703 (1952). It is true that a single flood that does not permanently damage the land, or threaten to recur on a regular basis, will often not be a "substantial" enough interference with property rights to constitute a "taking" of the

---

[5] The case relied on holds that mature crops ready for harvest and a flowage easement were "taken." *Barnes v. United States*, 538 F2d 865, 872 (Ct Cl 1976). The points city relies on here come from discussions or comments outside the holdings in that case.

*land*. However, no stretch of the Oregon definition of "taking" is required to hold that one flood can substantially lessen the value of or destroy *personal property*, such as the livestock and crops in this case.

In arguing that the livestock and cattle in this case were not "taken," defendant relies primarily on *State ex rel Dept. of Trans. v. Glenn*, 288 Or 17, 602 P2d 253 (1979). In *Glenn*, the state condemned land where the private landowner wintered his cattle. The cattle had to be moved in short order. Some cattle died during and after removal to other, less salubrious quarters. Damages for these losses were denied in the condemnation. The court in *Glenn* stated:

> "If, in removing his personal property, the condemnee sustains *removal costs* or damages to his personal property, such expenses or losses are not recoverable from the condemnor. The rule is stated in 1 Orgel on Valuation Under the Law of Eminent Domain 306, § 69 (1953):
>
>> " 'The weight of authority is in support of the ruling which denies compensation to the owner for *removal costs* and breakages or other injury to personal property.\* \* \*'
>
> "'\* \* \* \* \*
>
> "We hold that any damages for loss of cattle in this case do not fall within the category of property 'taken' for public use under the provisions of Article I, Section 18, of our Constitution." (Footnote omitted; emphasis added.) 288 Or at 20-21.

It is clear that *Glenn* focused on whether to compensate in condemnation for the costs of removal of personalty where underlying realty is taken and compensated. The necessity to remove personal property from condemned realty is not a substantial interference with the owner's rights in the personal property, *i.e.*, personal property is not "taken" simply because it needs to be moved.[6] Thus, *Glenn* is distinguishable. The plaintiffs' allegations and evidence concerning

---

[6] The Court of Appeals' opinion speaks in terms of consequential versus direct damages. Stating that the harm caused by the government is a consequential damage is a frequent way of saying that the owner's property rights have not been interfered with so as to constitute a taking. *See Thornburg v. Port of Portland*, 233 Or 178, 194, 376 P2d 100 (1962) (terms such as consequential damages are "conclusions that the court reached when it had decided that the facts involved did not measure up to the standard necessary for a 'taking' "). Of course, damages can be indirect and thus noncompensable because they are too remote or speculative, *e.g. State Highway Comm. v. Compton*, 265 Or 339, 507 P2d 13 (1973) or not caused by the government

destroyed crops and livestock support an award of condemnation damages here. Livestock killed and crops destroyed by a governmentally instituted action are permanently taken.

### B. May Crops Be Taken Separately From Land?

Defendant contends that the trial court erred in letting the jury consider the immature growing crops as an entity separate from the real property on which they were growing and that no compensation is due plaintiffs for the separate loss of the growing crops. We hold that the destroyed crops, although growing from the land, are a separate entity, capable of being separately damaged and are not subject to limiting rules applicable to real property. Courts have supported separate consideration of growing crops in two ways: by the fiction of constructive severance; or, by recognizing a statutory classification of the growing entity as "goods" under the sales portion of the commercial code and treating them accordingly. Oregon applies its statutes, recognizing that growing crops are "goods," *i.e.*, personal property. In *Paullus v. Yarbrough*, 219 Or 611, 623, 637, 347 P2d 620 (1960), the court stated:

> "Since, under the contract before us, the timber was 'agreed to be severed' we must decide whether timber is included in the definition of 'goods' under ORS 75.760.
>
> "* * * * *
>
> "On the basis of our previous cases it is reasonable to conclude that we have recognized that a contract for the sale of timber requiring severance by the purchaser brings the transaction within the Sales Act."

After that case was decided, the portion of the Sales Act referred to was replaced by ORS 72.1070(2), which provides:

> "A contract for the sale apart from the land of growing crops or other things attached to realty and capable of severance without material harm thereto but not described in subsection (1) of this section or of timber to be cut is a contract for the sale of goods within ORS 72.1010 to 72.7250

---

action. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 574, 825 P2d 641 (1992) (measure of damages includes depreciation of remaining property not taken "caused by the taking" of other portions of property). The statement made by the court in *State ex rel Dept. of Trans. v. Glenn*, 288 Or 17, 20, 602 P2d 253 (1980), to the effect that the damages are too "indirect" to be compensable, simply means that the need for removal and its costs that may be incurred do not qualify as a "taking."

whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."

Other states, including our neighboring state of Washington, achieve the result by the fiction. Examples are *Rudy-Patrick v. Dela Costa Farming*, 16 Wash App 911, 557 P2d 869, 871 (1976) (where there is constructive severance of crops, conveyance of real property without reservation does not always transfer ownership of the growing crops because "[c]rops are considered realty in some transactions and personalty in others. [Citations omitted.]") and *Paik v. Chung*, 123 Wash 37, 211 P 729, 731 (1923) (statutory labor lien of agricultural worker helping with growing crops "does not attach to the land or to any interest in the land. It attaches to the crop only."). As we have said in *Smith v. Howell*, 91 Or 279, 293, 176 P 805 (1919), "a growing crop * * * becomes upon severance from the realty personalty." The court has also said that an Oregon statute produces the same result. *Hosteteler v. Eccles*, 112 Or 572, 580-81, 230 P 549 (1924) (the emblements statute [now ORS 91.230] permits an action in tort for conversion of the crop).

The trial court erred in directing a jury verdict in defendant's favor and in removing the "taking" question related to destroyed personalty from the jury.

Where uncompensated condemnation occurs, attorney fees are due. ORS 20.085 promises:

"In a proceeding brought under section 18, Article I * * * by an owner of property * * * if the owner * * * prevails, the owner * * * shall be entitled to * * * reasonable attorney fees at trial and on appeal."

Attorney fees are claimed in specific ways under our rules of procedure. ORCP 68 C(2) provides:

"A party seeking attorney fees shall allege the facts, statute, or rule which provides a basis for the award of such fees in a pleading filed by that party. Attorney fees may be sought before the substantive right to recover such fees accrues. No attorney fees shall be awarded unless a right to recover such fee is alleged as provided in this subsection."

Plaintiffs did allege their right to attorney fees. In the usual case, after the legal threshold of evidence to show substantial interference is met, whether there was substantial interference to constitute a taking in fact becomes a jury question. *Thornburg v. Port of Portland, supra,* 233 Or at 192 (continuing substantial interference). But, where, as here, the only proof is that the property was destroyed, plaintiff is entitled to a verdict on that point as a matter of law. However, in this case, the inverse condemnation theory was never submitted to the jury.

Normally, we do not require remand where the error is not harmful. Although the trial court erred when it prevented the jury from considering plaintiffs' inverse condemnation claim, that error does not require a new trial in this case because the jury has already assessed the amount of plaintiffs' damages for the crops and livestock killed and thus taken. Here, the personal property involved was destroyed. The jury assigned all liability for that destruction to defendant city, an allocation of fault that is presently binding. The damage amounts found by the jury are binding against defendant in the inverse condemnation context, through the application of the principles of issue preclusion, in that defendant has had full opportunity and motivation to litigate the amount of damages that plaintiffs may recover for the crops and livestock.[7] Of course, only one recovery of that amount of damages will be permitted but, under ORS 20.085, defendant is also liable to plaintiffs for reasonable attorney fees under the inverse condemnation theory. Therefore, we remand the case to the trial court to establish the reasonable fees due plaintiffs.

---

[7] Restatement (Second) of Judgments (1982), § 27, 250 (1982) in part states:

"When an issue of fact * * * is actually litigated and determined * * * and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

The judgment has not been finally entered for the damages only because of the present appeal. Our resolution of that appeal confirms that judgment for damages for destruction of the crops and livestock is appropriate. The evidence of amount of damages for destruction of the crops and livestock and the other dimensions of that issue appear identical, confirming under comments c and j to section 27 that issue preclusion is appropriate.

The decision of the Court of Appeals is reversed in part and affirmed in part. This case is remanded to the circuit court for proceedings consistent with this opinion.