Argued and submitted May 1, 1992, affirmed April 21, reconsideration denied September 1, petition for review denied October 26, 1993 (318 Or _____)

Harry BENSON,
*Appellant,*

*v.*

CITY OF PORTLAND,
*Respondent.*

(9005-03217; CA A68717)

850 P2d 416

Steven E. Benson, Portland, argued the cause and filed the brief for appellant.

Valencia R. Tolbert, Deputy City Attorney, Portland, argued the cause and filed the brief for respondent.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

De MUNIZ, J.

Rossman, P. J., dissenting.

* Leeson, J., *vice* Buttler, J., retired.

## De MUNIZ, J.

Petitioner is the owner of several unoccupied residential buildings that the City of Portland has declared derelict and required to be registered pursuant to Chapter 24.80 of the Portland City Code (PCC). He brought this writ of review proceeding, seeking reversal of the city's orders on the grounds that the derelict building legislation violates the Due Process and Equal Protection Clauses[1] of the federal constitution and the takings clauses of the state and federal constitutions. The trial court upheld the orders. Petitioner appeals, and we affirm.

■     PCC 24.15.065 defines a "derelict building" as

"any building, structure or portion thereof which is unoccupied and meets any of the following criteria:

"(a)   Has been ordered vacated by the Director pursuant to 29.10.090(c) or (d);

"(b)   Has been issued a correction notice by the Director pursuant to 29.10.090(a);

"(c)   Has been posted for violation of Section 18.03.050, more than once in any two year period;

"(d)   Is unsecured;

"(e)   Is boarded."

Upon a determination by the responsible city officials that a building is derelict, the owner must (1) register the building in accordance with PCC 24.80.020; (2) submit to quarterly inspections of the building, PCC 24.80.020F; (3) pay a yearly fee of $400 for each building that remains derelict, PCC 24.80.030; and (4) submit, as part of the registration documents,

"information relating to the location and ownership of the building, the expected period of its vacancy (such period to be mutually agreed upon by the owner and the Director), a plan for regular maintenance during the period of vacancy, and a plan for its reoccupancy and use, or its demolition, which plans shall be reviewed by and are subject to the approval of the Director." PCC 24.80.020C.

---

[1] The relevant assignment of error refers only to the Equal Protection Clause. Petitioner's supporting argument also refers to Article I, section 20, of the Oregon Constitution. The substance of the argument makes no distinction between the two provisions.

The fee may be waived if certain conditions are met.

Section 24.80.020G is the principal object of petitioner's discontent. It provides:

"When all code violations have been corrected and a derelict building has been legally reoccupied, or when the building has been demolished, and the lot cleared in accordance with the provisions of this Title, it shall cease to be a derelict building."

The determinations of derelict status are subject to two levels of city review under sections 24.80.020E and 24.80.040 of the code and are then judicially reviewable by writ of review.

In his first assignment, petitioner contends that section 24.80.020G offends the prohibitions on uncompensated takings in Article I, section 18, of the Oregon Constitution and in the Fifth Amendment. He does not attempt to differentiate between the applicable law under the two provisions. The theme of his argument, however, is that his buildings are residential; that, if not demolished, a "vacant building *must* be reoccupied (*i.e.*, rented) in order to cease to be a derelict building;" and that "[r]e-renting is thus compulsory." (Emphasis petitioner's.) He concludes that it is a *per se* taking under both constitutions for an owner to be required to allow tenants or other third parties to live in or to occupy his property.

■     The city responds, first, that petitioner has not been subjected to any reoccupancy or demolition *requirement* under section 24.80.020G, because there is none; petitioner may choose, instead, to submit indefinitely to the mandatory provisions of the legislation, such as the annual fee requirement. The city also contends that, even assuming petitioner's premises and legal conclusions, the legislation is an exercise of the "police power"[2] that gives rise to no taking under either constitution.

In the balance of this opinion, we will assume, without deciding, the correctness of petitioner's premise that a taking would have occurred if he were required to lease space

---

[2] We use the term "police power" guardedly, as a short-hand description of the governmental authority to regulate private property without involving governmental or public acquisition of private property. We recognize that the fashion and the usefulness of the term are questionable.

in his buildings to tenants. *Compare Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982). However, he does not show how or why the city's legislation does require that. Petitioner has not yet performed in accordance with the "reoccupancy" provision, let alone been compelled to do so. Consequently, his challenge is a facial one, and his burden is to show that the provision, first, *necessarily refers* to rentals or other undesired occupation by third parties and, second, *compels* him either to rent the buildings or demolish them. He does not succeed on either prong.

In equating "reoccupied" with rentals, petitioner simply posits that meaning, and assumes all others away. His assumption presupposes that the only use that can qualify as a reoccupancy is around-the-clock residential use. In the absence of any suggestion by petitioner that only that use would meet applicable zoning requirements, *see Schoonover v. Klamath County*, 105 Or App 611, 616, 806 P2d 156, *rev den* 311 Or 432, *cert den* ____ US ____ (116 L Ed 2d 327) (1991), we cannot accept his argument. Neither petitioner's assumption nor the dissent's reading of insurance case law and the other inapposite authorities on which it relies shows that "reoccupied" can have only the one meaning they choose to give it; moreover, neither is consistent with this court's obligation to construe the legislation consistently with its constitutionality, if possible. As far as the language of the facially challenged legislation reveals, it is as compatible with ongoing commercial and myriad other uses of the buildings, by petitioner or his agents, as it is with residential tenancies or other third-party occupancies.

The dissent suggests that we have not given sufficient consideration to the meaning of "occupancy," "reoccupancy" and like terms. To the contrary, for purposes of this *facial* constitutional challenge, the preceding paragraph supplies all the definition that is necessary or permissible: It demonstrates that the language of the legislation *can* be constitutionally applied.

Equally fundamental, neither reoccupancy specifically nor section 24.80.020G generally are stated as mandatory requirements. They simply define what relieves a building from its previously declared derelict status. They do

not state that a property owner must pursue that relief and, for purposes of a facial challenge, we are not at liberty to add *any* requirement to those the legislation provides, let alone one that could, arguably, *create* a constitutional problem.

Petitioner relies on *Seawall Assocs. v. City of NY*, 74 NY2d 92, 544 NYS2d 542, 542 NE2d 1059 (1989), as his principal authority. That case, of course, does not bind us. More significantly, however, it seems to demonstrate the error in petitioner's argument rather than lending support to him. The regulation in *Seawall* that the New York court held to violate the Fifth Amendment expressly imposed requirements on the owners of certain properties that they lease them to tenants and that they restore them for and retain them as rental space. Violations were punishable by fines of up to $150,000. Stated another way, the *Seawall* legislation *expressly required* what petitioner reads into the Portland legislation, although it contains no such requirements. The regulations in *Seawall* were so different from the legislation here that the case is completely useless to our analysis.

A far more analogous case is *Nelson v. Benton County*, 115 Or App 453, 839 P2d 233 (1992). The property owner there appealed to LUBA and, in turn, to us, from the county's determination that his 1.37-acre parcel did not qualify for a nonfarm dwelling. The statutory and ordinance standard allowed such dwellings only on property that is generally unsuitable for agricultural use. *See* ORS 215.283(3)(d). The county concluded that, although the property in question was sub-sized, it was not "generally unsuitable," because it could be used for farming in conjunction with nearby, separately owned, farming operations. The owner argued that that determination constituted a taking, because it "effectively force[d] the sale or lease of the land." We rejected that argument, explaining:

> "The county's decision does not compel or even suggest that he sell, lease or do anything else with his land. Rather, it holds that, along with other reasons, the property is not generally unsuitable for productive farm use because it can be operated for that purpose in combination with adjacent or nearby properties; therefore it does not qualify for a nonfarm dwelling." 115 Or App at 457.

Similarly, here, petitioner mistakenly identifies an uncompelled potential consequence of a regulation as being part of the regulation. The city simply does not require petitioner to lease his property to others, and he advances no other basis for concluding that his property has been taken within the meaning of either constitution. Petitioner and the dissent rely on hypotheses about how the city's legislation might cause owners of derelict buildings to act, rather than focusing on the relevant issue, *i.e.*, what the language of the legislation actually requires the owners to do.

■ *Nelson v. Benton County, supra*, illustrates another problem with petitioner's argument: He does not differentiate among the types of governmental actions on which takings claims can be predicated and, therefore, he does not identify the legal standards that apply to this claim. Here, as in *Nelson*, "[t]he only constitutional tests that have any application are those pertaining to regulatory takings," and, as in *Nelson*, petitioner's claim cannot survive those tests, because he does not demonstrate that the legislation deprives him of all "economically viable and substantial beneficial use of his property." 115 Or App at 458.

■ A property owner has a high threshold to surmount in order to obtain compensation from the government for losses occasioned by a regulation of property that serves a legitimate governmental objective. As the court said in *Eckles v. State of Oregon*, 306 Or 380, 398, 760 P2d 846 (1988), "[e]xercise of the 'police power,' unlike exercise of the 'eminent domain power,' does not require compensation." *See also Nollan v. California Coastal Comm'n*, 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987); *Gruner v. Lane County*, 96 Or App 694, 773 P2d 815 (1989).[3] Petitioner comes nowhere close to approaching that threshold.

Many of the points that the dissent makes go well beyond petitioner's arguments. Nevertheless, the dissent comes no closer to the threshold, and many of its propositions rest on misreadings of the authority on which it relies. For example, it quotes very selectively from *Fifth Avenue Corp. v.*

---

[3] We do not imply that regulations of use and exercises of the police power would not constitute takings if they compelled a property owner to allow permanent physical occupation of land by the government or third parties. However, as we have held, the Portland legislation does not do that.

*Washington Co.*, 282 Or 591, 613, 581 P2d 50 (1978), in support of its conclusion that the city is acting in an "enterprise capacity." When the language from *Fifth Avenue* that surrounds but is omitted from the dissent's quotation is read, however, the opposite conclusion follows, *i.e.*, the city is acting in a purely regulatory capacity.

We reject petitioner's taking argument. His due process[4] and equal protection arguments come to nothing more than assertions that the city's regulations do not treat all of the possible permutations of the regulated conditions in precisely the same way. That shows no constitutional infirmity.

Affirmed.

**ROSSMAN, P. J.,** dissenting.

I do not agree with the majority that PCC 24.80 does not effect an unconstitutional taking of petitioner's properties. One of the primary purposes of Article I, section 18, of the Oregon Constitution, is to ensure that public burdens are paid for by the public and not by a particular individual. I agree that relieving the hazards associated with blighted areas and dilapidated housing is a laudable goal and one of high social order. However, it is the duty of this court to guarantee that the accompanying financial burden is not placed on private property owners in a manner that offends constitutional principles. In my opinion, Article I, section 18, simply does not permit the city, without providing just compensation, to force owners to either lease their buildings to third parties or to ransom their property rights.

Article I, section 18,[1] provides, in relevant part:

"Private property shall not be taken for public use * * * without just compensation * * *."

---

[4] The assignment that petitioner labels as a due process challenge seems instead to be a takings argument, drawing on *Nollan v. California Coastal Comm'n, supra*. The argument is equally unmeritorious under either designation.

[1] Petitioner's claim is also based on the Fifth Amendment to the federal constitution. However, because I must consider petitioner's state constitutional claim first, *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983), and because I believe that the ordinance effects a taking under Article I, section 18, I do not reach petitioner's federal takings clause claim. Nevertheless, I refer to the federal constitution and federal cases when of assistance in my analysis under the Oregon Constitution. *See Suess Builders v. City of Beaverton*, 294 Or 254, 259 n 5, 656 P2d 306 (1982); *Cereghino v. State Highway Com.*, 230 Or 439, 445, 370 P2d 694 (1962).

To establish that PCC 24.80 is facially invalid, petitioner must demonstrate that the ordinance (1) effects a taking of private property, (2) commits the property to a public use, and (3) does not include an offsetting provision for fair compensation. I note at the outset that PCC 24.80 does not contain a fair compensation provision. My analysis, therefore, focuses on whether it effects a taking of private property for a public use. I am convinced that it does.

One of the flaws in the majority's analysis is its reliance on *Nelson v. Benton County*, 115 Or App 453, 839 P2d 233 (1992). As the majority recognizes, the issue there was whether the county's determination that the petitioner's 1.37-acre parcel was not a nonfarm dwelling constituted a *regulatory* taking. Thus, the petitioner was required to show that the legislation deprived him of "an economically viable and substantial beneficial use of his property[.]" *Nelson v. Benton County, supra*, 115 Or App at 458. Here, however, petitioner does not contend that PCC 24.80 effects a *regulatory* taking. Rather, he alleges that PCC 24.80.020G's requirement that a derelict building be "reoccupied" for it to regain non-derelict status effects a *physical* taking of an owner's property by forcing him to offer his property for rent. I believe that he is correct.

A *physical* taking occurs under the Oregon Constitution when government action substantially interferes with an owner's use and enjoyment of the owner's property. *Hawkins v. City of La Grande*, 315 Or 57, 68, 843 P2d 400 (1992). The term "property" in Article I, section 18, does not refer to the physical thing over which the owner exercises control, but "denote[s] the group of *rights* inhering in the [owner's] relation to the physical thing, as the right to possess, use and dispose of it." *Lincoln Loan v. State Hwy. Comm.*, 274 Or 49, 55, 545 P2d 105 (1976), *quoting Cereghino v. State Highway Com.*, 230 Or 439, 445, 370 P2d 694 (1962). (Emphasis supplied.) One of the most coveted rights held by a landowner is the right of possession, which includes the right to exclude others from occupying the property. *Restatement of Property* § 7 (1936); *Igo et al. v. Butler et al.*, 199 Or 423, 428, 262 P2d 675 (1953). Indeed, the right to exclude "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter*

*Manhattan CATV Corp.*, 458 US 419, 440, 102 S Ct 3164, 73 L Ed 2d 868 (1982); *Kaiser Aetna v. United States*, 444 US 164, 176, 100 S Ct 383, 62 L Ed 2d 332 (1979). Accordingly, when the Supreme Court has perceived that the government has negated the right to exclude by authorizing a third party to occupy a landowner's property, it has found a *physical* taking. *See Loretto v. Teleprompter Manhattan CATV Corp., supra*; *Kaiser Aetna v. United States, supra.*[2]

In *Loretto v. Teleprompter Manhattan CATV Corp., supra*, the Court reviewed a New York statute that required an owner of residential property to "permit a cable television company to install its cable facilities upon his property." 458 US at 426. The regulation effected an unconstitutional *physical* taking, because it *"required* the landlord to suffer the physical occupation of a portion of his building by a third party." 458 US at 440. (Emphasis in original.) The lesson learned from *Loretto* is that the government effects a physical taking whenever "it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 US ___, 112 S Ct 1522, 1528, 118 L Ed 2d 153, 165 (1992). (Emphasis in original.) Indeed, "this element of required acquiescence is at the heart of the concept of occupation." *FCC v. Florida Power Corp.*, 480 US 245, 252, 107 S Ct 1107, 94 L Ed 2d 282 (1987). Thus,

> "whether the government floods a landowner's property, or does no more than require the landowner to suffer the installation of a cable, the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property." *Yee v. City of Escondido, Cal., supra*, 503 US at ___, 112 S Ct at 1528. (Citations omitted.)

Here, PCC 24.25.215 provides that a building is "unoccupied" if it is "not being used for a lawful occupancy." However, the ordinance does not define the term "occupancy" or indicate when a building is considered "reoccupied." When a statute or ordinance does not define a term used therein, the term will be defined in accordance with its ordinary meaning. *Nicolai-Morgan Products Co. v. Employment Div.*, 102 Or App 578, 582, 795 P2d 598 (1990); *Naumes*

---

[2] In *Loretto*, the Court recognized that a physical taking may be found where the occupation is by the government itself or by third parties under its authority. 458 US at 433 n 9.

*of Ore. v. Employment Div.*, 23 Or App 57, 61, 541 P2d 141 (1975). The ordinary meaning of "reoccupy" can be discerned from treatises that have defined the term and from statutes and case law[3] that have resolved when a building is "occupied" for purposes of determining coverage under a fire insurance policy.[4]

A building is "occupied" when it is used in a manner consistent with the purpose for which it was designed. 67 CJS, "Occupy." *See also* ORS 479.010(1)(f).[5] Thus, a residential building is "occupied" when it is "in actual use by human beings who are living in it as a place of habitation."[6] *Schoeneman v. Hartford Fire Ins. Co.*, 125 Or 571, 575, 267 P 815 (1928); *Weidert v. State Ins. Co.*, 19 Or 261, 283-84, 24 P 242

---

[3] In determining whether a building is "occupied" within the meaning of a fire insurance policy, courts have not considered the term in a technical sense, but rather in a popular sense, and have accorded to it a reasonable and practical construction that is consistent with its common and ordinary meaning. Annot., 36 ALR3d 505 (1971 & 1992 Supp.); Annot., 47 ALR3d 398 (1973 & 1992 Supp.); *National Sec. Fire & Cas. Co. v. James*, 358 SO 2d 737, 739 (Ala. Civ. App. 1978) (noting that the term "unoccupied" as interpreted in a fire insurance policy comports with the definition that is commonly accepted by the general public); *Jelin v. Home Ins. Co.*, 5 F Supp 908, (D NJ), aff'd 72 F2d 326 (3rd Cir 1934) (considering the etymology and common usage of "unoccupied" in arriving at a definition).

[4] Fire insurance companies include "occupancy" clauses in their policies because the risk of a fire decreases when an insured building is used by humans. *See Jelin v. Home Ins. Co.*, 5 F Supp 908, 909 (D NJ 1934), aff'd 72 F2d 326 (3rd Cir 1934). Courts have interpreted the term "occupancy" in insurance policies in a practical and sensible manner that is consonant with the insurer's object of minimizing the risk of fire. *See* Annot., 36 ALR3d 505 (1971 & 1992 Supp.); Annot., 47 ALR3d 398 (1973 & 1992 Supp.)

The meaning of "occupancy" that has emerged from the insurance cases also effectuates the city's purpose in requiring "reoccupancy" under PCC 24.80. Like the insurance companies, the city has imposed its "occupancy" requirement to minimize a risk — the risk of a building becoming or remaining derelict, *see* PCC 24.80.010 — and has concluded that a building is less likely to become derelict if it is "occupied." Thus, as in a fire insurance policy, the "occupancy" requirement in PCC 24.80 is designed to lessen the likelihood of an undesirable result (a derelict building) by mandating human use of the premises. It logically follows that the same reasonable and practical interpretation of "occupancy" that has evolved from the insurance cases should be applied here as well.

[5] The term "occupancy" is defined in ORS 479.010(1)(f), the insurance code section entitled "PROTECTION OF BUILDINGS FROM FIRE." That section provides, in pertinent part:

" 'Occupancy' means the purpose for which a building or structure is used or intended to be used. * * *"

[6] PCC 24.15.140 defines "residential structure" as "any building or other improvement designed or intended to be used for residential purposes."

(1890); ORS 479.010(1)(h).[7] It is not necessary that there be someone constantly in the dwelling, but only

> "that it is the place of usual return and habitual stoppage. It is not sufficient, therefore, that furniture, tools, or other chattels may be left in the building, or that it is occasionally [or frequently] visited and inspected by some one [*sic*], or is used and controlled, though not inhabited, by a tenant, or is used temporarily as a place of abode." *Schoeneman v. Hartford Fire Ins. Co., supra*, 125 Or at 575.

To "reoccupy" a residential building that falls into a derelict state, either the owner or a third party must take up permanent residence there. It is untenable to expect an owner to move from a current home into the derelict building and establish permanent residence there merely to satisfy the "reoccupancy" requirement; indeed, if a person owns more than one building, unless that person has the comparable powers of elasticity of a super-hero like Plastic Man, it would be physically impossible for the person to "reoccupy" all of them. As a practical matter, the owner is *required* to admit persons as tenants, with all the possessory and other rights accorded that status, or be subject to a $400 annual fee.[8] PCC 24.80.020G thus compels owners to rehabilitate their properties and offer them for rent, thereby requiring owners to be residential landlords and depriving them of their quintessential rights of possession and exclusion. In short, the city has required non-resident owners either to consent to a physical invasion of their properties or pay a fee as a penalty.

---

[7] ORS 479.010(1)(h) defines "private residence" as

"that part of a single, double or multiple dwelling house or building occupied as *living or sleeping quarters by one or more family units* * * *." (Emphasis supplied.)

"Family" is defined as

"an individual or two or more persons related by blood or marriage or a group of not more than five persons, excluding servants, who need not be related by blood or marriage, living together in a dwelling unit." ORS 469.010(d).

[8] I also conclude that the provision in PCC 24.80.030E that permits the Director to waive the $400 fee if certain conditions are satisfied fails to mitigate the constitutional defects of the ordinance. Before the Director can waive the fee, he or she must approve a plan submitted by the owner that provides for the reoccupancy or demolition of the building. *See* PCC 24.80.020C; PCC 24.80.030E. Moreover, even if such a plan is submitted by the owner and approved by the Director, there is no guarantee that the fee will be waived.

I would reach the same conclusion if the subject property was commercial rather than residential. To be "occupied," a commercial building must be in use by a person who is operating it as a place of business.[9] *See* 67 CJS, "Occupy"; *Weidert v. State Ins. Co., supra,* 19 Or at 283-84. It is unrealistic to expect an owner to launch a new business or, assuming that the owner is in business for himself or herself, to move the concern to the "derelict" building, to ensure that the building is "reoccupied." As is the case with residential properties, the owner is *required,* as a practical matter, to lease the property to a third party to fulfill the "reoccupancy" requirement.[10] It is the nature of the invasion that is determinative — the owner is forced to accept the occupation of the property by a third party and is deprived of the elemental rights of possession and exclusion.

The majority argues that my interpretation of PCC 24.80 is inconsistent with this court's obligation to construe the ordinance as constitutional if a reasonable construction is possible. I recognize that we do have such a duty, but do not believe that PCC 24.80 is susceptible to a reasonable interpretation that would render it constitutional. The majority, without ever defining the term "occupancy," suggests that we interpret the "reoccupancy" requirement as being satisfied "with ongoing commercial and myriad other uses of the buildings, by petitioner or his agents * * *."[11] 119 Or App at 410. However, as mentioned previously, assuming that an owner is financially able and that the building is amenable to commercial use, the owner cannot be forced to launch a commercial venture merely to fulfill the "reoccupancy" requirement. Nor do I think it would be feasible for an owner, or anyone else, to use a "derelict" residential building that is

---

[9] The dispositive factors in determining whether a building other than a dwelling is occupied are the nature of building and the normal incidents of its use. Annot., 36 ALR3d 505 (1971 & 1992 Supp.)

[10] My interpretation also comports with the definition of "occupancy" in *Black's Law Dictionary* 1078 (6th ed 1990):

"Taking possession of property and use of the same; said *e.g.,* of a tenant's use of leased premises[.]"

[11] Because the resolution of this case turns on what a property owner must do to satisfy the "reoccupancy" requirement, I believe that it is essential to define the term "occupancy." It seems anomalous to me that the majority is able to conclude that PCC 24.80 does not compel a physical invasion of an owner's properties without providing a precise definition of that term.

located in a residential area for commercial purposes. Indeed, in all likelihood, the applicable zoning requirements would prohibit such a use. I believe that the majority's reading of PCC 24.80 overlooks the true implications of the "reoccupancy" requirement and ignores the practicalities of the situation.

I believe that this case is not far removed from *Seawall Assocs. v. City of NY*, 74 NY2d 92, 544 NYS2d 542, 542 NE2d 1059 (1989), which squarely addresses the question presented here, *i.e.*, whether tenancies coerced by the government effect a physical taking of the land owner's property, and provides what I believe is the correct answer. In *Seawall*, the City of New York enacted an ordinance which, among other things, required owners of single-room occupancy properties to restore all units to habitable condition and to lease them to a *bona fide* tenant for an indefinite period. The ordinance also required owners to pay a $500 per unit penalty for each unit that remained unrented. In holding the ordinance unconstitutional on its face, the court stated:

> "Where, as here, owners are forced to accept the occupation of their properties by persons not already in residence, the resulting deprivation of rights in those properties is sufficient to constitute a physical taking for which compensation is required [under New York's state constitution and the Fifth Amendment].
>
> "* * * * *
>
> "Although the Supreme Court has not passed on the specific issue of whether the loss of possessory interests, including the right to exclude, resulting from tenancies coerced by the government would constitute a *per se* physical taking, we believe that it would. Indeed, it would be difficult to see how such forced occupancy of one's property could not do so.
>
> "By any ordinary standard, such interference with an owner's rights to possession and exclusion is far more offensive and invasive than the easements in *Kaiser Aetna* or *Nollan* [*v. California Coastal Comm'n*, 483 US 825, 837, 107 S Ct 3141, 97 L Ed 2d 677 (1986)] or the installation of the CATV equipment in *Loretto*." 74 NY2d at 103-04.

Although *Seawall* is not binding on this court, I find the opinion well reasoned and persuasive.[12] I conclude that Portland's

---

[12] The majority asserts that *Nelson v. Benton County, supra*, is analogous because, there, "[t]he county[ did] not compel or even suggest that [petitioner] sell,

requirement that a derelict building be "reoccupied" requires a physical invasion that substantially interferes with a land-owner's possessory rights and, therefore, constitutes a *physical* "taking" of his property.[13]

I also believe that the destruction of an owner's building, under PCC 24.80.020G, is a compensable taking under Article I, section 18. A municipality can, pursuant to its police power and without compensating the owner, demolish a structurally impaired building that threatens the public welfare only if the owner, after reasonable notice and opportunity, refuses to repair it. *Shaffer v. City of Winston*, 33 Or App 391, 394-95, 576 P2d 823 (1978). PCC 24.80 effects an unconstitutional taking, because it does not give the owner this "prior opportunity for repair." 33 Or App at 395 n 3. To be free from the burdens imposed by the ordinance, the owner must not only repair the building, the owner must also have it reoccupied, a requirement that I believe achieves a taking of the property in and of itself.

I also conclude that the requirements of PCC 24.80 compel owners of derelict buildings to dedicate their properties for a "public use." Two of the primary objectives of the ordinance are to mitigate the blighting impact of derelict buildings and to prevent buildings from falling into a derelict state. PCC 24.80.010. The city contends that the accomplishment of those objectives helps prevent neighborhoods from deteriorating to such an extent that the safety and welfare of

---

lease or do anything else with his land." 119 Or App at 411. The short answer to that contention is that, here, the ordinance *does* compel the land owner to do something with the land. It requires the owner either to "reoccupy" the building, which, as a practical matter, forces the owner to lease the building to a third party, or to have the building destroyed. PCC 24.80 thus imposes affirmative duties on the property owner that are qualitatively more severe and invasive than a mere restriction on the *use* of property that was at issue in *Nelson*.

[13] I acknowledge that the physical occupation of the owner's premises may not be permanent. PCC 24.80 does not require that, once the building is reoccupied, it remain occupied for an indefinite period. Once the building is leased to a tenant and used in a manner consistent with the purpose for which it was designed, then presumably the reoccupancy requirement would be satisfied. If the tenancy ends, PCC 24.80 does not obligate the landowner to re-lease the building. Nevertheless, there would be a physical taking for whatever time period that the tenancy was in effect. *See Schoonover v. Klamath County*, 105 Or App 611, 806 P2d 156, *rev den* 311 Or 432, *cert den* ___ US ___, 112 S Ct 375, 116 L Ed 2d 327 (1991); *First Lutheran Church v. County of Los Angeles*, 482 US 304, 107 S Ct 2378, 96 L Ed 2d 250 (1987).

the residents are threatened; indeed, it is well recognized that blighted areas receive "a disproportionate amount of attention of fire, police, and health departments." *Foeller v. Housing Authority of Portland*, 198 Or 205, 239, 256 P2d 752 (1953).

In *Foeller*, the Supreme Court also recognized that, when a certain section of a city "sinks into a substandard condition which subjects the city's health, morals and safety to uncommon hazards, *the [taking] of the area by the public for the purpose of eradicating its evils and thwarting recrudescence summons the property to public use.*" 198 Or at 253. (Emphasis supplied.) Portland, therefore, by mandating that derelict buildings be repaired and "reoccupied" or destroyed as part of an effort to alleviate the hazards associated with blighted areas,

> "is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good. * * * Where government acts in its enterprise capacity * * * there is a compensable taking." *Fifth Ave. Corp. v. Washington Co.*, 282 Or 591, 613, 581 P2d 50 (1978), *quoting Fred F. French Inv. Co., Inv. v. City of New York*, 39 NY 2d 587, 593, 385 NYS 2d 5, 350 NE2d 381 (1976).

The majority criticizes my omission of certain language from the passage quoted above. It asserts that when the omitted language is inserted, it requires the conclusion that the city is acting in a purely regulatory capacity. 119 Or App at 412-13. What the majority has failed to acknowledge is that PCC 24.80 entails a government acquisition of property and that, consequently, the city is acting in its "enterprise capacity" by regulating the blighting impact of "derelict" buildings in the manner that it does.

I am convinced that the $400 fee payment provision fails to mitigate the constitutional infirmities of PCC 24.80. With that provision, Portland is saying, in essence, that it will not perform an unconstitutional act if the owner pays the city not to do it. The fact that the owner is permitted to avoid the unconstitutional taking of his property by paying a "ransom" to the city cannot make the ordinance constitutionally acceptable. Indeed, the stark alternatives offered by PCC 24.80 — either submit to an unconstitutional taking of property or pay

$400 — amount to the type of exaction has been referred to as "an out-and-out plan of extortion." *Nollan v. California Coastal Comm'n, supra,* 483 US at 837.

The city nevertheless argues that PCC 24.80 is a valid exercise of its police powers. That is probably true. I do not dispute that the city has authority to require owners of derelict buildings to renovate and "reoccupy" their properties or have them demolished. The issue is whether those requirements amount to a taking of property and whether the city — in accordance with the Article I, section 18 — must compensate the land owners for it.

The majority, quoting *Eckles v. State of Oregon,* 306 Or 380, 398, 760 P2d 846 (1988), asserts that the "[e]xercise of the 'police power,' unlike exercise of the 'eminent domain power,' does not require compensation." 119 Or App at 412. However, where a valid police power regulation also amounts to a taking of private property for a public use, compensation *is* required. As the United States Supreme Court noted in *Loretto v. Teleprompter Manhattan CATV Corp., supra:*

> "The Court of Appeals determined that [the statute] serves the legitimate public purpose of 'rapid development of and maximum penetration by a means of communication which has important educational and community aspects,' * * * and thus is within the State's police power. We have no reason to question that determination. *It is a separate question, however, whether an otherwise valid [police power] regulation so frustrates property rights that compensation must be paid.*" 458 US at 425. (Citations omitted; emphasis supplied.)

I conclude that PCC 24.80 so drastically interferes with an owner's basic property rights that it effects a physical taking of the owner's property for a public use. Even though the ordinance may be a permissible exercise of the city's police power, absent an offsetting provision for fair compensation, I would hold that it effects a taking of property that violates Article I, section 18, of the Oregon Constitution. As Justice Holmes admonished in *Pennsylvania Coal Co. v. Mahon,* 260 US 393, 416, 43 S Ct 158, 67 L Ed 322 (1922):

> "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant

achieving the desire by a shorter cut than the constitutional way of paying for the change.''

I dissent.