Argued and submitted October 16, 1996, reversed February 5, petition for review allowed June 17, 1997 (325 Or 438)
See later issue Oregon Reports

D. E. (Gene) PENLAND,
Cathy Penland, Enid Madding,
Ray Ritchey, Lucy Ritchey,
Ken Goodrich, Leola Goodrich,
Richard Vischer, Pam Vischer,
Ron Danyluk, Sue Danyluk,
William Bushnell, Judy Bushnell,
Roger Barklow, Shirley Barklow,
Dave Price, Linda Price, Chuck King, Wanda King,
Gordon Hewlett and Amelia Hewlett,
*Respondents,*

*v.*

REDWOOD SANITARY SEWER
SERVICE DISTRICT,
a municipal corporation,
*Appellant.*

(94-CV-0209; CA A90247)

934 P2d 434

James H. Boldt argued the cause and submitted the briefs for appellant.

John R. Huttl argued the cause for respondents. With him on the brief were William V. Deatherage and Frohnmayer, Deatherage, Pratt, Jamieson & Clarke, P.C.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant Redwood Sanitary Sewer Service District (the District), a municipal corporation, appeals from a judgment in an action for nuisance, enjoining the District from continuing to operate a facility that converted human waste sludge into compost. The District argues, in part, that the trial court erred in determining that its actions were not shielded by "discretionary function" immunity under the Oregon Tort Claims Act (OTCA). ORS 30.265(3)(c). On *de novo* review, ORS 19.125(3), we conclude that the District's actions are entitled to immunity, and reverse.

The District operates sewage-related facilities, including a sewage treatment plant, in rural Josephine County. As part of the sewage treatment process, the District reduces incoming raw sewage to sludge, or biosolids, a bacteria-laden condensed form of sewage, by draining the liquids from the solids. Before 1988, the District trucked the sludge to various sites for land application, which involved spreading the sludge over a large area for agricultural and disposal purposes.

In 1988, the District's manager, Weber, who was charged with day-to-day oversight of its operations, instituted a small-scale pilot composting operation at the treatment plant. In July 1990, the District instituted composting on a permanent basis.

In the initial stages of the composting process, sludge is solidified by being poured into an outdoor levee, or "drying ring," which is exposed to the open air. After about two weeks, the material loses enough moisture to be mixed with organic material for composting. The reduced sludge, or biosolids, is then mixed with organic materials, such as wood, animal bedding, including animal waste, and yard waste, provided by local residents and businesses. The bacteria in the sludge break down the mixture. In order for the bacteria to decompose the sludge, the mixture must be exposed to air. Thus, the mixture is placed in a large pile, approximately nine feet high, 20 feet wide, and 100 hundred feet long, and exposed to the open air. The composted material is first piled over a perforated pipe for aeration. After two to three weeks,

the pile is removed from the pipe and is turned every two weeks for aeration. There are normally seven piles at one time, each in a different stage of the composting process. Defendant uses heavy equipment to move the piles as they decompose and to load the finished product.

After approximately 90 days, the material becomes finished compost, which defendant sells to the public as mulch or soil amendment. The product, called Jo-Gro, contains no nutrients for fertilizing but is valuable for retaining moisture in soils.

If the sludge mixture is not aerated, it becomes anaerobic and, as a result, generates hydrogen sulfide. Hydrogen sulfide can cause headaches, nausea, and throat problems, and its odor is akin to that of rotten eggs. Hydrogen sulfide is generally released whenever a compost pile or the sludge pool is disturbed, but some level of hydrogen sulfide is always present as a result of the composting operation.

Plaintiffs are landowners and homeowners who live in rural Josephine County near the plant and composting operation. Many lived in the neighborhood before the District instituted the permanent composting operation. The closest plaintiffs, the Penlands, live about 180 feet from the property where the composting activities take place. Plaintiffs and other neighbors began to notice odor, noise, and dust, which they associated with the composting operation, in October 1991. Beginning in February 1992, plaintiffs and others complained to the District that, because of the odor and noise they ascribed to the plant, they were unable to enjoy outdoor activities, such as gardening, sitting on their porches, and barbequing. In response to those complaints, the District undertook several measures, including placing sound deflection panels on the electric wood grinder. Plaintiffs apparently found those measures to be ineffective and their complaints continued.

In early 1994, the District's board of directors, which consists of three members of the Josephine County Board of Commissioners, appointed a nine-member *ad hoc* citizen's committee to recommend mitigation measures. The committee, which included three of the present plaintiffs, submitted

its report to the board, identifying a range of potential measures, with their respective costs and benefits. The *ad hoc* committee's recommendations included using sound absorbing equipment mufflers to reduce noise, applying a commercial deodorizer to reduce odors, adding spray misters to reduce dust, and relocating the composting operation to eliminate all negative impacts to the neighbors.

Before acting on the *ad hoc* committee's report, the board asked Weber, the District's manager, to review and comment on those recommendations. Weber did so, submitting a detailed report, which recommended that the operation be continued at its present site but that various mitigation measures be implemented. On June 17, 1994, a majority of the board (one member dissented) adopted Weber's recommendation to continue the composting operation at the sewage plant while implementing 21 of the *ad hoc* committee's recommended mitigation measures. Those measures included using a quieter loader, constructing vegetation screens, adding sound mufflers to equipment, eliminating construction lumber demolition, applying a commercial deodorizer, mixing the sludge more rapidly and efficiently, using fly bait, and adding dust-reducing spray misters.

In August 1994, plaintiffs filed this action, seeking to enjoin the continuation of the composting operation. Plaintiffs alleged that that operation created a nuisance in that it created excessive odor, noise, and dust and interfered with the reasonable use of their properties.[1] The District denied the allegations of nuisance and argued that, in all events, the balance of equities militated against the issuance of an injunction. The District also raised various affirmative defenses, including laches, conformity with regulatory law, and "coming to the nuisance." Of particular relevance to our review, the District asserted a defense of "discretionary function" immunity under the Oregon Tort Claims Act, ORS 30.265(3)(c).

---

[1] Plaintiffs also alleged that the composting operation violated land use law. However, the land use claim was bifurcated and consolidated for trial with another case and, thus, is not at issue in this appeal.

ORS 30.265(3)(c) provides:

"Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

Before the trial court, plaintiffs argued that discretionary function immunity did not bar their claims for two reasons. First, because pre-OTCA decisions uniformly recognized that municipal corporations could be liable for nuisance, the OTCA, including discretionary function immunity, was inapplicable. Second, even if the OTCA did apply, the District had failed to prove the requisites of such immunity. The trial court implicitly rejected the first argument but adopted the second. In particular, the court remarked:

"[The directors] were clear that all major policy decisions are to be made by the Board of Directors. But it was apparent to me that [the directors] had not done that; that basically what they had done was allow Mr. Webber and Mr. Funk to make those decisions, despite the fact that it is their responsibility to make those decisions. * * * I think you're not meeting your responsibility if all you do is rubber stamp what decisions are made by staff. And in essence, that was the impression I have as to what was done here is that basically the Board of Directors has allowed the staff and the manager to make the decisions that are their responsibility to make by law."

The court subsequently rendered the following findings:

"(3) The Board of Directors never made an independent decision with respect to the commencement of the composting of sludge on the premises of the sewage treatment facility plant, but rather allowed Mr. Weber and his staff to make this decision; however, there was no evidence that the Board of Directors actually delegated this authority to Mr. Weber. To the contrary, the evidence established that the Board of Directors, as well as Mr. Weber, all viewed this decision to be a decision to be made by the Board of Directors.

"(4) In making their decision of June 17, 1994, to authorize the continuation of the composting operations, the defendant's Board of Directors did not consider costs involved in possibly relocating the composting operations; did not consider what percentage of materials being collected were not being used in the composting operation; did not consider any financial information concerning the costs or income from the composting operation; and did not consider the report of an acoustical engineer hired by the District who had determined that the noise levels at the site had exceeded DEQ limits. Rather, the Board merely adopted Mr. Weber's recommendations, even though they had not delegated to him the authority to make this decision."

The court further determined that plaintiffs were entitled to prevail on the nuisance claim[2] and, consequently, entered judgment enjoining continuation of the composting operation 12 months after the entry of judgment.[3]

On appeal, the District raises a battery of assignments of error that, *inter alia*, challenge the trial court's rejection of its discretionary function immunity defense.[4] As amplified below, we conclude that the District was entitled to prevail on its discretionary function immunity defense. Because that holding is dispositive, we do not address the District's other arguments.

ORS 30.260(8) defines "tort" for purposes of the Oregon Tort Claims Act as

"the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or for a protective remedy."

---

[2] The court, after specifically finding plaintiffs' witnesses to be credible, found that the composting operation "substantially and unreasonably interfere[s] with these plaintiffs' use and enjoyment of their properties."

[3] The judgment provided that, in addition to the 12-month "grace period," it would automatically be stayed in the event of an appeal.

[4] The District also argues that plaintiffs failed to adduce clear and convincing evidence of a nuisance and that, even if plaintiffs' proof was sufficient, the balance of equities militated against the issuance of injunctive relief.

*See also Urban Renewal Agency v. Lackey,* 275 Or 35, 38, 549 P2d 657 (1976) (defining "tort" for OTCA purposes, before enactment of ORS 30.260(8), as "[a]ny breach of a legal duty resulting in damages, other than those duties created by contract"). Plaintiffs' nuisance claim falls within the scope of that definition.

Plaintiffs argue, nevertheless, that the OTCA does not apply to nuisance claims against municipal corporations, because a line of pre-OTCA authority, stretching back nearly to statehood, recognized that municipal corporations were subject to liability for nuisance without reference to concepts of discretionary function immunity. Plaintiffs assert that the OTCA was intended to expand, rather than to limit, governmental tort liability[5] and that, consistent with that purported purpose, it would be anomalous to apply OTCA-based defenses to constrict governmental liability for nuisance claims.

■    Plaintiffs are correct that, before the OTCA's enactment, municipal corporations were broadly subject to liability for nuisance.[6] However, plaintiffs are wrong that the

---

[5] *See, e.g., Yunker v. Mathews,* 32 Or App 551, 558, 574 P2d 696, *rev den* 282 Or 537 (1978) (Thornton, J., specially concurring) ("The central purpose of the Tort Claims Act in waiving governmental immunity was to give an aggrieved citizen a remedy against a governmental body which was not theretofore available to him.").

[6] *See, e.g., Levene et ux v. City of Salem,* 191 Or 182, 196-98, 229 P2d 255 (1951) (city held liable for creating a public nuisance by diverting the flow of a stream onto the plaintiffs' land and flooding their building); *Adams v. City of Toledo,* 163 Or 185, 190-92, 96 P2d 1078 (1939) (rejecting city's immunity defense to claim for fire-related damages, where fire department set fire to an abandoned building and fire spread to plaintiff's adjacent property); *Miller v. City of Woodburn,* 126 Or 621, 625, 270 P 781 (1928) ("[A] municipal corporation has no more right to pollute the waters of a stream or to injure the lands of another than has a natural person."); *Ulmen v. Town of Mt. Angel,* 57 Or 547, 550-51, 112 P 529 (1911) ("It is the duty of the town to dispose of its drainage in some manner that will not create a nuisance to individuals or the public.").

*Wilson v. City of Portland,* 153 Or 679, 58 P2d 257 (1936) is perhaps most analogous to the present case. There, the plaintiffs sued the city for dumping garbage into a ravine next to their property. The court found that the city had created and maintained a nuisance in compelling plaintiffs to "breathe foul fumes and odors coming from an *unsanitary* fill," *id.* at 684, and rejected the city's defense that it was immune because it was acting in a "governmental capacity":

"Neither do we think that a city is acting in a governmental capacity or in the performance of any public duty in the creation or maintenance of a public nuisance, but is rather acting in violation of its public duties[.] Can it be that a city is acting for the public welfare when it dumps putrid and foul smelling

OTCA's enactment did not alter that liability. The OTCA controls and qualifies municipal corporations' liability for nuisance. That is so for at least three reasons. First, the text of the OTCA does not admit to the exception plaintiffs urge. The definition of "tort," as noted, is extremely broad, and the legislature has not carved out any exception for nuisance.[7]

Second, the Supreme Court has held that, subject to constitutional constraints, *e.g.*, Oregon Constitution, Article I, section 10, the OTCA governs and conditions municipal corporations' tort liability, expressly including liability on claims for which municipalities had no pre-OTCA immunity. *See Hale v. Port of Portland*, 308 Or 508, 518-24, 783 P2d 506 (1989).[8]

Third, the Supreme Court has suggested, albeit in *dictum*, that, where the requisites for discretionary function immunity are satisfied, *i.e.*, that " 'the decision was made as a policy judgment by a person or body with governmental discretion,' " such immunity can bar liability for governmental actions akin to the creation of a nuisance. *Hawkins v. City of La Grande*, 315 Or 57, 65, 843 P2d 400 (1992) (quoting *Little v. Wimmer*, 303 Or 580, 588, 739 P2d 564 (1987)); *see also Miller v. Grants Pass Irrigation*, 297 Or 312, 686 P2d 324 (1984) (assuming that plaintiffs' claims, which included a claim for negligent or reckless maintenance of a nuisance, were governed by the OTCA).

We turn, then, to plaintiffs' alternative contention that, even if their nuisance claim is subject to the OTCA, the District failed to prove the elements of discretionary function immunity. The scope and content of discretionary function

---

garbage and refuse within 300 feet of a person's home, rendering it an unfit place in which to live?" *Id.* at 686 (citations omitted).

[7] The legislative history of the 1985 amendments to the OTCA, which included the adoption of the definition of tort, now set out at ORS 30.260(8), *see* Oregon Laws 1985, chapter 731, section 31, and Oregon Laws 1987, chapter 705, section 6, does not include any discussion of the breadth of the definition of tort or any mention of the OTCA's coverage of nuisance claims. *See* Tape recording, House Committee on State and Federal Affairs, HB 2152, February 18, 1985, Tape 60, Side A at 88.

[8] Plaintiffs here do not contend that applying the OTCA and particularly ORS 30.265(3)(c), to their nuisance claim would somehow be unconstitutional.

immunity is, as the Supreme Court has observed, "notoriously obscure and difficult." *Miller*, 297 Or at 320. Nevertheless, 20 years of judicial construction of ORS 30.265(3)(c) has distilled some guiding principles. In *Mosley v. Portland School Dist. No. 1J*, 315 Or 85, 89, 843 P2d 415 (1992), the court explained:

> "To be immune under ORS 30.265 (3)(c), the decision at issue must be 'a policy judgment by a person or body with governmental discretion.' *Little v. Wimmer*, 303 Or 580, 588, 739 P2d 564 (1987). The statute provides immunity 'to decisions involving the making of policy, but not to routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action.' *Lowrimore v. Dimmitt*, [310 Or 291, 296, 797 P2d 1027 (1990)]."

In *McBride v. Magnuson*, 282 Or 433, 436-37, 578 P2d 1259 (1978), the court described the types of decisions that are "discretionary" for purposes of government immunity:

> "[N]ot every exercise of judgment and choice is the exercise of discretion. It depends on the kind of judgments for which responsibility has been delegated to the particular officer. Discretion, as this court has noted in other contexts, involves 'room for policy judgment,' or the responsibility for deciding 'the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued.' It involves the delegated responsibility for 'assessment and ranking of the policy objectives explicit or implicit in the statute' and for the judgment that one or more of these objectives will be served by a given action[.] In other words, insofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated responsibility for the latter kind of value judgment." (Citations omitted.)

Thus:

> "A public body that owes a particular duty of care (such as that owed by a school district to its students who are required to be on school premises during school hours) has wide policy discretion in choosing the means by which to

carry out that duty. The range of permissible choices does not, however, include the choice of not exercising care. Normally, a choice within the permissible range, in order to qualify for immunity, is one that has been made by a supervisor or a policy-making body." *Mosley*, 315 Or at 92 (citations omitted).

Here, plaintiffs argue that the requisites of discretionary function immunity were not satisfied in two respects. First, they contend that the District had a "non-discretionary duty" to abate the alleged nuisance—that is, that the District "had no discretion 'to determine not to exercise its discretion' to choose one or another course of action, though the choice itself might be the exercise of discretion." *Miller*, 297 Or at 321. Second, plaintiffs assert—and the trial court agreed— that the District's board did not engage in the sort of "assessment of costs and benefits, the evaluation of relative effectiveness and risks," *McBride*, 282 Or at 437, that is a prerequisite of discretionary function immunity. We disagree with both contentions.

This is not a case in which a governmental entity "decided not to decide" and, in so doing, ignored the potential or actual consequences of its conduct. *Compare Mosley*, 315 Or at 92 ("The range of permissible choices does not * * * include the choice of not exercising care."). Instead, the record discloses that the District, when confronted with complaints by plaintiffs and others about excessive odor and noise allegedly associated with the composting operation, undertook various mitigation measures but rejected others, including moving the operation. In particular, the District began using a deodorizing process to reduce the hydrogen sulfide odor, created a vegetation screen to muffle excessive noise, and added spray misters to settle dust. The choice of those measures, rather than others, including moving the plant, is the essence of immunized discretion. *See Mosley*, 315 Or at 92 ("A public body that owes a particular duty of care * * * has wide policy discretion in choosing the means by which to carry out that duty."); *see also Day v. City of Canby*, 143 Or App 341, 352-53, 922 P2d 1269 (1996) (city was entitled to discretionary function immunity from claims arising from parade in city limits, where city, in issuing parade permit, considered safety concerns and directed permittee to

coordinate parade planning with police and public works department).[9]

■ We note, moreover, that the decision to continue operations with on-site mitigation, rather than to cease operations or to condemn plaintiffs' property, was made by the District's politically accountable policy-making body, its board. ORS 451.485. *Accord Hawkins*, 315 Or at 65 (decision of "city's functionary" to release untreated effluent into a slough, "did not create any future governmental or 'departmental policy' "); *McBride*, 282 Or at 438 ("policy discretion is more likely to be found at or near the level of political responsibility"). Although the board's decision was based, in large part, on the information and advice it received from Weber, the District's manager, we are persuaded, on *de novo* review, that the board did, in fact, exercise its statutory policy-making and supervisory authority. The board had before it the recommendations of the *ad hoc* citizen's committee, Weber's report, and evidence concerning the district's financial capabilities, the proximity of the plant, and inconvenience to the neighbors. The board's decision, thus, necessarily involved an assessment of the "costs and benefits," the "relative effectiveness and risks," and the "competing goals and priorities" associated with continuing the plant's operation with mitigation measures. *McBride*, 282 Or at 437.

We thus conclude that the board's decision did, in fact, involve "policy judgment by a person or body with governmental discretion." *Little*, 303 Or at 588. Defendant was entitled to prevail on its discretionary function immunity

---

[9] In *Day*, we rejected plaintiff's argument that the city was not entitled to discretionary function immunity because it did not adequately consider "specific dangers to the public from [bolting] horses":

"Plaintiffs reasoning * * * would extend liability to City for every conceivable danger that could occur when it grants a parade permit and someone is injured at that parade. Such reasoning would assign courts the role of deciding whether governmental entities and their officials had adopted proper policies or whether a given course of action was effective in furthering a given policy. That is not our function." 143 Or App at 353 (citation omitted).

*Accord Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 22 n 20, 734 P2d 1326 (1987) ("We think that a school principal's failure to take any precautions whatever, if that was unreasonable, is not an exercise of policy discretion, though a school board's choice between expenditures on security personnel or other types of safeguards might be.") (citation omitted).

defense. The trial court's determination to the contrary was error.

Reversed.