Submitted on remand from the Oregon Supreme Court June 26, affirmed
September 30, 1998

D. E. (Gene) PENLAND;
Cathy Penland; Enid Madding;
Ray Ritchey; Lucy Ritchey;
Ken Goodrich; Leola Goodrich;
Richard Vischer; PamVischer;
Ron Danyluk; Sue Danyluk;
William Bushnell; Judy Bushnell;
Roger Barklow; Shirley Barklow;
Dave Price; Linda Price;
Chuck King; Wanda King;
Gordon Hewlett and Amelia Hewlett,
*Respondents,*

*v.*

REDWOOD SANITARY SEWER SERVICE DISTRICT,
a municipal corporation,
*Appellant.*

(94-CV-0209; CA A90247)

965 P2d 433

James H. Boldt for appellant.

John R. Huttl, William V. Deatherage and Frohnmayer, Deatherage, Pratt, Jamieson & Clark for respondents.

Before DeMuniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

## HASELTON, J.

This case is before us on remand from the Supreme Court, 327 Or 1, 956 P2d 964 (1998). In our original opinion, 146 Or App 225, 934 P2d 434 (1997), we held that, regardless of whether the defendant District's operation of a composting facility constituted a nuisance, the operation was shielded by "discretionary function" immunity under the Oregon Tort Claims Act (OTCA), ORS 30.265(3)(c), and, thus, the trial court had erred in enjoining the facility's operation. 146 Or App at 225-37. The Supreme Court reversed, concluding that discretionary function immunity under the OTCA "confers immunity on public bodies only from liability for damages and does not confer immunity from injunctive actions" including, particularly, an action to enjoin a nuisance. 327 Or at 8.

Thus, on remand, we must address two issues that we initially deferred: *First*, is the composting operation a nuisance? *Second*, if so, does the balance of equities warrant issuance of permanent injunctive relief? On *de novo* review, *Jewett v. Dearhorn Enterprises, Inc.*, 281 Or 469, 473, 575 P2d 164 (1978), we answer both questions in the affirmative and, consequently, affirm.

To "reset the scene," we reproduce the summary of undisputed facts from our first opinion:

> "The District operates sewage-related facilities, including a sewage treatment plant, in rural Josephine County. As part of the sewage treatment process, the District reduces incoming raw sewage to sludge, or biosolids, a bacteria-laden condensed form of sewage, by draining the liquids from the solids. Before 1988, the District trucked the sludge to various sites for land application, which involved spreading the sludge over a large area for agricultural and disposal purposes.

> "In 1988, the District's manager, Weber, who was charged with day-to-day oversight of its operations, instituted a small-scale pilot composting operation at the treatment plant. In July 1990, the District instituted composting on a permanent basis.

"In the initial stages of the composting process, sludge is solidified by being poured into an outdoor levee, or 'drying ring,' which is exposed to the open air. After about two weeks, the material loses enough moisture to be mixed with organic material for composting. The reduced sludge, or biosolids, is then mixed with organic materials, such as wood, animal bedding, including animal waste, and yard waste, provided by local residents and businesses. The bacteria in the sludge break down the mixture. In order for the bacteria to decompose the sludge, the mixture must be exposed to air. Thus, the mixture is placed in a large pile, approximately nine feet high, 20 feet wide, and 100 hundred feet long, and exposed to the open air. The composted material is first piled over a perforated pipe for aeration. After two to three weeks, the pile is removed from the pipe and is turned every two weeks for aeration. There are normally seven piles at one time, each in a different stage of the composting process. Defendant uses heavy equipment to move the piles as they decompose and to load the finished product.

"After approximately 90 days, the material becomes finished compost, which defendant sells to the public as mulch or soil amendment. The product, called Jo-Gro, contains no nutrients for fertilizing but is valuable for retaining moisture in soils.

"If the sludge mixture is not aerated, it becomes anaerobic and, as a result, generates hydrogen sulfide. Hydrogen sulfide can cause headaches, nausea, and throat problems, and its odor is akin to that of rotten eggs. Hydrogen sulfide is generally released whenever a compost pile or the sludge pool is disturbed, but some level of hydrogen sulfide is always present as a result of the composting operation.

"Plaintiffs are landowners and homeowners who live in rural Josephine County near the plant and composting operation. Many lived in the neighborhood before the District instituted the permanent composting operation. The closest plaintiffs, the Penlands, live about 180 feet from the property where the composting activities take place. Plaintiffs and other neighbors began to notice odor, noise, and dust, which they associated with the composting operation, in October 1991. Beginning in February 1992, plaintiffs and others complained to the District that, because of the odor and noise they ascribed to the plant, they were unable to enjoy outdoor activities, such as gardening, sitting on

their porches, and barbequing. In response to those complaints, the District undertook several measures, including placing sound deflection panels on the electric wood grinder. Plaintiffs apparently found those measures to be ineffective and their complaints continued.

"\* \* \* \* \*

"[In the summer of 1994, after receiving the recommendation of an advisory committee, the District's board of directors voted] to continue the composting operation at the sewage plant while implementing 21 of the *ad hoc* committee's recommended mitigation measures. Those measures included using a quieter loader, constructing vegetation screens, adding sound mufflers to equipment, eliminating construction lumber demolition, applying a commercial deodorizer, mixing the sludge more rapidly and efficiently, using fly bait, and adding dust-reducing spray misters.

"In August 1994, plaintiffs filed this action, seeking to enjoin the continuation of the composting operation. Plaintiffs alleged that that operation created a nuisance in that it created excessive odor, noise, and dust and interfered with the reasonable use of their properties."

146 Or App at 227-29 (footnote omitted).

■■     In determining whether the composting operation constitutes a nuisance—*i.e.*, whether it substantially and unreasonably interferes with the use and enjoyment of plaintiffs' property—we must assess five factors: (1) the location of the claimed nuisance; (2) the character of the neighborhood; (3) the nature of the thing complained of; (4) the frequency of the intrusion; and (5) the effect upon the plaintiff's enjoyment of life, health and property. *Jewett*, 281 Or at 473. Whether a condition constitutes a nuisance depends on its effect on "an ordinarily reasonable [person], a normal person of ordinary habits and sensibilities." *Id.* at 476. *See also Smith v. Wallowa County*, 145 Or App 341, 346, 929 P2d 1100 (1996).

■     The trial court, in oral remarks that comported with its ultimate written findings and conclusions, explained its application of those factors:

"I want to start out, first of all, before I go on to the issue of nuisance, I'd just like for the record—I know it's not really evidence, but I was taken on a view of the property

and I think it's important that the record reflect, as everyone agrees, that this is a residential area. It fronts the Rogue River. The day we were out there, there were osprey flying over the river. There's fish. It's a beautiful, very much a residential, rural nature, despite the fact that it's been divided into small parcels.

"* * * * *

"I do find that the nature of the defendant's use of its property has substantially changed since most of the plaintiffs purchased their property. It's changed from a use that would have been consistent with just the sewage treatment facility plant, with the rural residential nature of the surrounding properties, to a use that's more akin to, in the words of one of the defendant's witnesses, an industrial site. The changing nature, in this respect, of the defendant's use of the property, I do not believe could have been reasonably foreseen by the plaintiffs.

"I do find specifically that—I find the plaintiffs to be credible in their testimony. With respect to the noise regulations, the defendant's witnesses testified that they are to be enforced at the county level, not by DEQ; that DEQ lacks both the authority and the staff to pursue noise complaints, and that the county has not done any testing as to the noise complaints on this property, nor pursued really any complaint in that respect. The acoustical expert hired by the county, by the sewage district, stated his opinion that the noise level at one point at least did result from the composting operations and that they exceeded established levels.

"Odor is a very subjective type of issue. There is certainly testimony from many of the defendant's witnesses that there's no odor at all. I can't believe that. There is no dispute that hydrogen sulfide is produced by these operations. There's no dispute that hydrogen sulfide can cause the very symptoms that the plaintiffs testified they were experiencing. And in fact there has been no government agency that has tested for hydrogen sulfide levels at this site, so any finding that they're in compliance is not based on any study or any testing that has been done on the site.

"I am completely convinced that the nature of the odor that's produced by the defendant's composting operations does cause some of the plaintiffs to gag, to be nauseated, to have headaches, to be unable to eat, and to be unable to sit in their yards or patios or otherwise utilize their yards. And

by doing so, that the odor substantially and unreasonably interferes with the plaintiffs' use and enjoyment of their property. I also am convinced that the nature of the noise and the frequency of the noise at the site caused by the composting operations also substantially and unreasonably interferes with the plaintiffs' use and enjoyment of their property."

Without exhaustively detailing the evidence and our analysis, we agree with the trial court that the composting operation is a nuisance. The District's sewage treatment plant, including the composting operation, is located in an area zoned RR-1 (rural residential one-acre) on the Rogue River. Many, and perhaps all, of the plaintiffs live or own property within one-quarter mile of the facility.

Two dozen witnesses, sixteen of whom reside or own property near the treatment facility, testified that the composting operation frequently created an offensive odor.[1] Those witnesses variously described the odor as: "Stench." "Real offensive." "Sickening, very sickening." "Between a rotten egg and a rotten skunk." "Like a cat litter box." "Never smelled anything like it in my life." "About 500 outhouses all at once." And "I was in World War II, and I smelled some dead bodies and it had a smell something like that."[2] Plaintiffs' witnesses testified that the intensity and frequency of the odor varied but, in general, depending on the location, the odor could be unbearably nauseating as often as several times a week.

The District points to testimony by other witnesses, including scientists and experts in sewage treatment, that the composting operation did not generate an offensive odor—or at least not an odor that could be consistently detected as offensive at plaintiffs' property. In a related sense, the District argues that, given expert meteorological

---

[1] Of those witnesses, sixteen were plaintiffs.

[2] A report by an acoustical engineer retained by the District acknowledged that "odor, not noise, is the real problem here." In addition, the District's manager, Robert Webber, admitted that, on one occasion when he was at the plaintiff Penlands' home for a meeting, he "could detect an odor" and that several of the persons attending the meeting "went inside the house or started toward the house" but "I found it hard to believe that there was something that would drive them into the house or away."

evidence based on evaluation of wind-direction data and the timing of certain plaintiffs' complaints, the source of the odor plaintiffs' witnesses described was a dairy across the river from the treatment plant.

Conversely, many of plaintiffs' witnesses testified that they could distinguish the dairy smell from the compost smell: "It's a characteristic sewage smell. It's completely different from any agricultural or dairy-type smell." "We had cows so we knew what the cows' odor was." "I have never found a dairy odor so offensive that I could not stand it." "I was raised on a cattle ranch, and I know the difference between the odor of human excrement and cattle." "I've got a dairy. I do smell the dairy too, and I know which one is which * * * The dairy can be bad at times, but Jo-Gro's smell is so distinctive. I can't handle that one. I go inside."[3] We note further that many of the plaintiffs who testified, albeit not all, owned their property before the composting facility began full-scale operation.

Reduced to its essentials, the District's position is that plaintiffs' witnesses either collectively imagined, were mistaken, or lied about the odors emanating from the composting operation. The trial court, which observed the witnesses, expressly determined that plaintiffs' witnesses were credible. We give that assessment "great weight," *Jewett*, 281 Or at 473, and, given the balance of the evidence, affirm the trial court's determination that the composting facility generated offensive odors that were consistently detectable on plaintiffs' property.

We further affirm the trial court's finding that the odor did, in fact, substantially and unreasonably interfere with plaintiffs' use and enjoyment of their property. Plaintiffs testified that the odor made them nauseated and prevented them from sitting on their decks or outside, or even from leaving their windows open at night for a summer breeze. For example, one plaintiff testified that she could not work in her garden when the odor was present and to get relief from the odor, "we have to go in the house or go to town

---

[3] Indeed, the District's plant operator, Laird Funk, acknowledged that he could distinguish the dairy smell from composting-generated odors.

or something." Another testified, "I can sit down and eat on the back porch with the dairy smell, but I can't with the Jo-Gro smell. I get sick." And a third testified, "we like to sleep with the windows open, and it is so offensive that I became sick at my stomach, and we had to close the windows to be able to sleep." Again, the trial court expressly found that testimony to be credible and, giving that assessment due deference, so do we.

■    The District argues, nevertheless, that, as a matter of law, there can be no nuisance because it has complied with all applicable regulations and permits in operating the composting facility. However, the District's purported regulatory compliance does not preclude a determination that its operation constitutes a nuisance. We categorically rejected an identical argument in *Lunda v. Matthews*, 46 Or App 701, 707, 613 P2d 63 (1980). Thus, in affirming an injunction against a nuisance, we explained:

> "[D]efendants argue that the operation of their plant was reasonable as a matter of law because they had secured an air contaminant discharge permit from the Department of Environmental Quality and they had not been cited for violation of the fallout standards. Conformance with pollution standards does not preclude a suit in private nuisance."[4]

*Id.* at 707.

■    We proceed to the second, and final, issue: Do the equities warrant the issuance of an injunction abating the nuisance? Concerning that issue, the trial court observed:

> "With respect to the balance of the equities in this case, and the remedy, I want to state first of all, I have no intention to join the Board of Directors of the sewage service district. I don't intend to micro-manage the affairs of the sewer service district. So for that reason I can't really get into a

---

[4] Defendant's reliance on *Hay v. Dept. of Transportation*, 301 Or 129, 719 P2d 860 (1986), is misplaced. In *Hay*, the court did not hold that compliance with rules and regulations precluded a determination of nuisance. Rather, the court held that "parking was not a private nuisance because the history of vehicular traffic on the beach demonstrates that the parking authorized by the rule was not unreasonable as a matter of law." *Id.* at 142. It was the history of parking on the beach, not the existence of a rule authorizing parking, that was dispositive.

situation where I'm setting what needs to be done to remedy the situation. I considered the alternative of damages because of that difficulty, but quite frankly, I don't think I can ascertain the damages because I think what the damages might be today might be different two years from now once the capacity of the plant has doubled. And I don't think that damages, for that reason, are easily ascertained in this situation, nor do I think it would be a final solution. I think you would just be inviting further litigation down the line if I tried to go that route.

"* * * * *

"[T]he defendant, since they have been aware of the plaintiffs' complaint, have expanded their operations and further invested in the composting operations on site, after becoming aware and having been notified of the complaints that were being made in this case. And I think that by doing that, quite frankly, it demonstrates some arrogance on the part of the defendant, as well as, doing so, they did it at their own risk. So I'm rejecting any consideration of the cost that has been expended since they've been aware of these complaints in balancing the equities. I don't think they're entitled to go out and make substantial expenditures when the case is in litigation and to try to use those as some way to avoid responsibility.

"* * * * *

"[A]s I said, balancing the equities in this case is really the most difficult. * * * I don't deny that there are other people who are not in this courtroom—the other patrons of the district who are going to be affected by my decision—and that's been the hardest part probably of making this decision is those considerations. But having considered that and considered the lack of any other remedy that I feel like would fit in the premises, I am going to grant the request for an injunction."

In *York v. Stallings*, 217 Or 13, 22, 341 P2d 529 (1959), the Court enunciated the standard for issuance of injunctive relief. Once a nuisance is established,

"it does not follow that an injunction should issue as a matter of course. The court may refuse an injunction in certain cases *where the hardship caused to the defendant by the injunction would greatly outweigh the benefit resulting to the plaintiff*. The injunction does not issue as a matter of

absolute or unqualified right but is subject to the sound discretion of the court."

*Id.* at 22 (emphasis added). *See also Jewett*, 281 Or at 478 (reiterating the "greatly outweighs" standard).

Thus, we must compare the benefit to plaintiffs with the hardship to the District resulting from a permanent injunction. The benefit to plaintiffs is the ability to enjoy their property in a manner consistent with its rural character—to garden, and eat outside, and keep their windows open on summer evenings. For plaintiffs, an injunction would mean being able to use and enjoy their property as they did before the nuisance came to them—to live, and breathe, free from a pervasive, nauseating odor.

The concomitant detriment to the District is essentially, but not completely, economic. If use of the existing composting facility is enjoined, the District has, at least, two arguably feasible alternatives: (1) move the composting activities to another site; or (2) return to its prior practice of trucking the sludge and applying it to acceptable agricultural sites.[5] Either of those options, even if otherwise practicable, would involve substantial additional expense. In addition, a return to the District's prior practice of land application would result in loss of significant environmental benefits.

The District's plant manager, Robert Webber, and Steven Gilbert, an environmental engineer retained by the District, testified persuasively that composting was an environmentally superior alternative to land application of biosolids. Webber explained, in some detail, why returning to its previous practice of land application was no longer a feasible alternative for the District, notwithstanding the fact that many districts and nearby municipalities in southern

---

[5] Although a third alternative would be for the District to buy out the plaintiffs, there is no evidence of the feasibility or expense of that option. A fourth alternative might be for the District to adopt additional and *effective* mitigation measures while maintaining the operation at its present site. There is, however, no evidence in this record concerning the practical availability and efficacy, much less the cost, of any such measures. *Cf.* G. Calabresi and A. D. Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv L Rev 1089, 1115-24 (1972) (describing various "rules" or approaches for abating or paying compensation for nuisances, derived from considerations of economic efficiency, "distributional goals" and "other justice reasons").

Oregon, including the City of Grants Pass, continue that practice. The concerns that Webber identified include groundwater contamination monitoring, site constraints, land use restrictions, sludge runoff, and grazing restrictions.

In contrast, the District's objections to relocating the composting operation to an alternative, nonresidential site appear to be purely financial. That is, in contrast to land application, there is no evidence that practical or legal impediments, including land use or environmental restrictions, would somehow preclude such relocation. The capital cost of relocating the existing composting operation (as distinct from any expansion of that operation to accommodate projected population growth and demands) would be approximately $1,000,000. The District currently serves approximately 1,800 households. The additional capital costs associated with relocating, amortized over a 20-year period, would result in a $5.00 per month rate increase per household over that period. In addition the District's annual operating costs would increase by approximately $100,000, representing the expense of trucking the present volume of bio-solids/sludge from the existing treatment plant to the newly relocated composting operation.

Assessing those alternatives, we conclude, as did the trial court, that the hardship to the District from the issuance of an injunction does not "greatly outweigh" the benefit to plaintiffs. There is no question that relocating the composting operation will, in fact, be expensive. Nevertheless, two factors especially bear on our assessment of the equities.

First, although a precise apportionment is impossible, the District's relocation expenses have been exacerbated by actions and additional expenditures that the District undertook after becoming aware of the Penlands' initial complaints in 1991 and of other plaintiffs' complaints by late 1992. This was not merely a case of the nuisance coming to the homeowners,[6] but of the District expanding its operations after plaintiffs protested. *See generally Swaggerty v. Peterson*, 280 Or 739, 748-49, 572 P2d 1309 (1978) (in action to

---

[6] As noted, most, but not all, plaintiffs owned their homes or property before full-scale composting operations began.

enjoin violation of restrictive building covenant, "[d]efendant cannot, after suit has been filed [to abate violation] * * * deprive [plaintiffs] of their right to complete relief by increasing his investment, and thus his potential hardship, before the final decision"); *Taylor v. McCollom*, 153 Or App 670, 680, 958 P2d 207 (1998) (where "the defendant has continued to build notwithstanding notification of a clear violation * * * the court may order injunctive relief, even if the balance of hardship cuts against the plaintiff").

Second, although the additional cost to the District will be substantial, the impact will be ameliorated because it can be spread among the District's rate-payers—over 1,800 households.[7] In that "cost-spreading" respect, *Thornburg v. Port of Portland*, 233 Or 178, 376 P2d 100 (1963), which involved an inverse condemnation claim by homeowners whose property lay beneath jet flightpaths of the then-newly expanded Portland Airport, is instructive. In reversing the trial court's limitation of the plaintiff property owners' claims, the court observed:

> "[W]hen the government conducts an activity upon its own land which, after balancing the question of reasonableness, is sufficiently disturbing to the use and enjoyment of neighboring lands to amount to a taking thereof, then the public, and not the subservient landowner, should bear the cost of such public benefit. * * * The real question was * * * one of * * * reasonableness based upon nuisance theories. In effect, the inquiry should have been whether the government had undertaken a course of conduct on its own land which, in simple fairness to its neighbors, required it to obtain more land so that the substantial burdens of the activity would fall upon public land, rather than upon that of involuntary contributors who happen to lie in the path of progress."

*Thornburg*, 233 Or at 193-94 (footnote omitted).

So too here. If the District and those whom it serves are committed to the environmental values and benefits of composting, that may well be laudable. But the cost of that commitment should be commonly borne and not visited solely

---

[7] Moreover, the number of the District's rate-payers is projected to double, and perhaps even triple, over the 20-year amortization period.

upon a handful of "involuntary contributors who happen to lie in the path of progress." *Id.* at 194. We emphasize that this is not a case of simple-minded "NIMBY"[8] parochialism—of narrow-minded refusal to assume burdens that are, reasonably and necessarily, part of living as a community. It is, rather, a clear and compelling case of living next to a public nuisance. The equities favor the issuance of an injunction.

Affirmed.

---

[8] "Not in my backyard."