Argued on review September 11, 1972, reversed March 1, petition for rehearing denied May 15, 1973

# STATE HIGHWAY COMMISSION, *Petitioner, v.* COMPTON ET AL, *Respondents.*

507 P2d 13

*John W. Osburn,* Solicitor General, Salem, argued the cause for petitioner. With him on the brief were Lee Johnson, Attorney General, Al J. Laue, Assistant Attorney General, and Leslie B. Hampton, Assistant Attorney General, Salem.

*John L. Schwabe,* Portland, argued the cause for respondents. With him on the brief were Andrew F. Fink and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN and HOWELL, Justices.

HOWELL, J.

The State of Oregon, through the Highway Commission, filed an action in eminent domain to take a portion of defendants' property for highway purposes. A jury returned a verdict for defendants for $78,500 as compensation for the taking. Defendants, unsatisfied with the award, appealed to the Court of Appeals, which reversed the judgment and remanded the case for a new trial. 9 Or App 264, 490 P2d 743 (1971). We granted review.

The issues involve the admissibility of certain evidence.

Before the taking, the defendants owned nine

lots consisting of approximately 40,000 square feet of land located on the east side of the city of Portland. The property was zoned for residential purposes, but there was evidence the zone could be changed.

An expert appraiser called by defendants testified that the highest and best use of defendants' property was for "retail commercial requiring substantial automobile traffic" such as a fast-food operation or a motel. Using the market data approach and considering sales of comparable properties, he found the amount of just compensation to be $217,000. He testified over objection that he also considered the income approach to valuation, as he believed the property could be leased for motel use at 50 cents per square foot, or a total of $20,100 net per year to the defendants. Capitalized at 8 per cent, the market value of the property taken would be $251,600.

Thereafter defendants offered certain evidence by a certified public accountant that the property could be leased to a national motel chain for the construction of a motel at a net rental to defendants of $24,000 per year for the land. The trial court rejected the testimony. The rejection was the primary basis of the defendants' appeal to the Court of Appeals, which held the evidence was admissible and reversed the case. We disagree and find that the evidence offered was highly speculative.

The record discloses the following relating to the proffered testimony of the certified public accountant, Mr. Rice.

Rice testified that he was a certified public accountant associated with a San Francisco firm which specialized in accounting and consulting work for various motel organizations. Part of the firm's service

was to advise purchasers, sellers, or lessees of the "realistic price to pay for property." As such, Rice had prepared many economic feasibility studies relating to motels.[①] When asked for his opinion "as to the suitability of the Compton property for a motel," the plaintiff objected. Defendants' counsel advised the court that Rice's testimony would involve only physical feasibility and not economic feasibility. Rice stated that he had not considered the sales of other properties, that he had not been hired to do an economic feasibility study, and, in his opinion, over 100 motel units physically could be placed on defendants' property.

Thereafter defendants sought to elicit testimony from Rice concerning the existence of a national standard for leasing motels and that such standard provided for a 7.5 per cent of room sales as rental to the lessor. Such a lease would provide a net return to defendants of $24,000 per year. The court sustained plaintiff's objection.

In the defendants' offer of proof, Rice testified as follows:

"Q Is it your testimony that based upon your experience in this area that any property that is

---

[①] Rice explained an economic feasibility study as:

"* * * a market study of the competitive area, gathering of available statistical information and population trends and economic growth and that type of thing. A study of the existing components in part to help determine what needs are for additional facilities in the market area. Another part of the study is to detail what we consider are the facilities that have the most likely chance of being economically feasible in that location, estimating the total costs of such a project using the facilities we have detailed, studying the income and expense that could logically be expected from that operation in that location after a breaking in period and relating the projected income against the projected project cost to tell him whether it is a feasible project or not."

suitable for that purpose would be leased for a certain figure—could be leased to a chain motel for a certain figure?

*"A Well, let's see. I am not sure I can honestly say that any property anywhere in the country that might have similar attributes to this would automatically be leased without question to a chain motel organization. I don't think I would care to make that statement.*

"Q I understand that, but—

*"A But I feel quite sure that this property could have been leased to a chain motel organization if it had been done by the right party.*

"* * * * *

"Q What is the minimum rental in your opinion?

"A I think in my opinion in bargaining between a competent landowner and between a chain motel that the minimum would probably be, the minimum would be two thousand a month or more.

"THE COURT: How do you arrive at that figure?

"THE WITNESS: *By the number of units I know could be placed on the property and probably would be placed on the property by the chain motel and also by the type of coffee shop restaurant facilities a chain would have located on the property, whether he operated it himself or leased it off."* (Emphasis supplied)

Rice also testified:

"Q Is there a standard minimum which would be applicable for property the size of the Compton property under such a lease?

"A No, not a standard minimum. The minimum is subject to bargaining between the lessee and the lessor as to the ultimate percentage rental.
"* * * * *

"Q  As a part of your investigation and study of the Compton property did you study or learn what the typical lease arrangements would be for property such as this?

"A  Not in connection with the Compton property. There is, however, a quite standard approach to land leases for chain motels."

■ Even if we were to assume that evidence of the amount that could be received from a lease of the property in its present condition for motel purposes was admissible, it is clear in the instant case that the evidence was inadmissible. Rice admitted that he had not studied typical motel lease arrangements in Portland which would apply to the defendants' property.[2] More importantly, there was absolutely no showing that the national standard rental of 7.5 per cent of room sales would be applicable to defendants' property. Rice admitted that he had not specifically applied the national standard to defendants' property, that the applicability of the national standard would depend on negotiations by "the right party," and that he had not conducted an economic feasibility study of defendants' property. It is inconceivable to us that a national motel chain would expend the funds necessary to construct a motel with 100 units and commit itself to a lease for $24,000 per year without conducting some sort of economic feasibility study.

---

[2] The defendants' expert appraiser who preceded Rice testified to the following regarding the preliminary study necessary to use the income approach if the property were leased:

"The first step, once again, you go to the real estate market to try to see what people in the market typically are doing and your opinion is based on a reflection of what people are doing in the market. After investigation of a number of land lease transactions you can with no particular difficulty determine what the average property owner expects as a return to him each year on his land."

We conclude that Rice's testimony was properly excluded as completely speculative.

■ In reversing the case, the Court of Appeals also held that the trial court erred in rejecting defendants' offer to introduce a drawing of a proposed motel which defendants stated they planned to build on the property.

The defendants testified that they had made an extensive study of the feasibility of constructing a motel on the property. In 1962 they hired a designer to prepare a set of preliminary drawings for a three-story motel and offered the drawings into evidence.

Assuming that the drawings were admissible,[9] we cannot see how the court's refusal to receive them

---

[9] In State Highway Com'n v. Deal et al, 191 Or 661, 233 P2d 242 (1951), we held that it was competent to show that a parcel of beach land could be subdivided. Quoting from 2 Nichols on Eminent Domain (2d ed) 1170, § 445, we stated:

" 'Evidence of the value of the property for any use to which it is reasonably adapted, is, as already stated, admissible, but such evidence must be limited to a bare statement why the property is adapted for a particular purpose and to testimony of its value for such purpose. As bearing upon these issues the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, but he cannot go further and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. *The owner cannot for example introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring; and the details of a possible improvement of the land, and its value, or the expected profits or rentals after such improvement was completed are equally inadmissible, for the same reason.* The trial court cannot be too careful in excluding evidence of this character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood of a large city with apartment houses filled with desirable tenants, and, with the aid of a little figuring, capitalize the

was prejudicial to defendants. The defendants testified that they intended to place a motel on the property. Their appraiser testified that one of the highest and best uses of the property was for a motel, and Rice, the certified public accountant, testified that over one hundred units physically could be placed on the property. With all of this testimony, the jury must have understood defendants' theory that they wanted either to build a motel, sell the property for a motel site, or lease the property to a national motel chain for the construction of a motel. Under these circumstances we fail to see how the court's refusal to admit a drawing showing a motel located on the property could have prejudiced the defendants.

We reverse the Court of Appeals and affirm the judgment entered by the trial court.

prospective net income at ten times the actual value of the land * * *. Such evidence does not tend to show market value, since it utterly disregards the fact that hundreds of acres of land upon which the same development could be equally well undertaken can be bought at prices determined by cold and unimaginative bargaining between seller and buyer and the immutable laws of supply and demand; but it sometimes misleads the jury and the only safe course for the court is to exclude it altogether.' (Italics added.)" 191 Or at 669-70.

In Highway Com. v. Assembly of God et al, 230 Or 167, 368 P2d 937 (1962), we held that an owner of land could show the land was in the process of being developed for its highest and best use. However, we also stated:

"We regard Mr. Book's testimony as descriptive only of the use to which the land was already dedicated—not as a prospective speculative use. This does not mean that defendants may show the contemplated costs of landscaping the condemned strip. And, it would not be proper to elicit testimony as to the specific improvements which defendants intended to make. Defendants are entitled to recover only the value of the land in its condition at the time of the taking and not the value of the land with the projected improvements. * * *" 230 Or at 176-77.