Argued and submitted May 30, reversed and remanded for new trial
October 17, 2001

STATE OF OREGON,
by and through its
DEPARTMENT OF TRANSPORTATION,
*Respondent,*

*v.*

Leslie W. FULLERTON
and Karen Fullerton,
husband and wife,
*Appellants,*

*and*

Howard W. PETERSON
and Eunice F. Peterson,
husband and wife,
*Defendants.*

C97-1304CV; A106704

34 P3d 1180

John Dudrey argued the cause for appellants. With him on the briefs was Williams Fredrickson, LLC.

David Farris Coursen, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Brewer, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

In this condemnation proceeding, the State of Oregon through the Department of Transportation (ODOT), condemned property belonging to defendants for the Camelot/Sylvan Interchange project on Highway 26 in Portland. After defendants Peterson defaulted, ODOT filed an amended complaint alleging that the just compensation for defendants Fullertons' property was $74,500.[1] The Fullertons answered that the value of the land taken and the damages to their remaining property were at least $200,000. The jury awarded $83,259 as just compensation. The Fullertons appeal, arguing in part that the trial court erred by submitting to the jury the issue of whether there were "special benefits" to their property arising from the condemnation without evidence that would have enabled the jury to calculate those benefits. We reverse on that ground.

Until ODOT condemned part of the Fullertons' land, their property had been used as a seven-unit apartment complex with accompanying garages. After the taking, the portion of the property the Fullerton's retained was still usable as a seven-unit apartment complex, but there was only one route of vehicle access to public roads instead of the two routes that had previously existed, and the remaining garage units were suitable only for personal storage rather than for parking vehicles. As a result of the loss of the garages, the Fullertons were required to add a parking facility to their property in order to provide the amount of parking required by building codes. The project also triggered the need for additional landscaping to bring the property up to code. The issue in this case focuses on whether the Fullertons' property benefitted in added value from ODOT's project. The parties agree that the law provides that any devaluation of property retained by a condemnee can be offset by the value of any

---

[1] The Fifth Amendment to the United States Constitution provides, in part, "[n]or shall private property be taken for public use, without just compensation." Article I, section 18, of the Oregon Constitution, provides, in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered[.]"

"special benefit" that is conferred on the remaining property by the taking.

During the discovery process before trial, the Fullertons were provided with appraisals from their own appraiser and from ODOT's appraiser as to the fair market value of the land taken. Neither appraisal reported that any amount of measurable "special benefit" had accrued to the Fullertons' remaining land. As a result, the Fullertons moved *in limine* to exclude consideration by the jury of the "special benefits" issue. ODOT objected, arguing that, while it might not be able to produce a numerical assessment of the monetary value of such benefits, it would be able to produce evidence from which special benefits could be inferred. The trial court denied the Fullertons' motion, and they first assign that ruling as error.

At trial, the parties presented expert testimony as to the value of the land taken. ODOT's experts disagreed with the Fullertons' experts as to that value, and there were multiple exhibits, calculations and photographs given to the jury from which it could determine a monetary value for the land. There also was evidence of the amounts by which the retained parcel had been devalued by the taking. However, there was no evidence of a monetary value of any special benefits to the property presented by either side. Some witnesses testified generally that the access to the property was structurally "better," and that the paved parking lot would be better than a gravel lot, but another witness testified that the Fullertons' property was "different, * * * but not necessarily better" because of the taking.

After the parties had finished presenting their evidence, they discussed the giving of a "special benefits" instruction. The court recognized that no monetary figure had been offered by the state as to the value of any special benefit but ruled that the issue could be submitted to the jury nonetheless. During closing arguments, the parties argued to the jury about the issue of special benefits. The Fullertons pointed to the appraisers' assessments that there were no monetary special benefits, while ODOT relied on inferences arising from the paving, landscaping, and new drainage work to be done by the state. Over the Fullertons' exception that

there was insufficient evidence to support the giving of such an instruction, the trial court told the jury that it could offset the value of any special benefits to the remaining property from its calculation of the Fullertons' loss because of the taking. That ruling forms the basis of the Fullertons' final assignment of error.[2]

On appeal, the Fullertons argue that, before the issue of special benefits can be submitted to a jury, there must be evidence from which it can find a specific amount of money that represents the benefit. They assert that the record is devoid of any such evidence. ODOT counters that, under Oregon law, special benefits evidence is admissible without a specific dollar amount and that the record supports the giving of an instruction on the subject. In addition, it argues that,

> "[E]ven if the challenged evidence had been inadmissible, its admission would have been, at most, harmless error in view of the benefits evidence that was admitted without challenge. That unchallenged evidence showed that before the project the owners' property had a narrow, potholed driveway and parking lot, and that when the project is complete, the property will have a paved access road and parking area and irrigated landscaping. It also showed that paved parking costs less to maintain than gravel parking and makes property more attractive to investors in urban areas, such as greater Portland. Other unchallenged evidence showed that putting the property to its highest and best use would require paving the parking area and bringing the landscaping up to current development code standards, that it would be expensive to do so, and that the project will make those changes."

"Special benefits" in a condemnation proceeding are benefits "peculiar to the [property]" that "increase its accessibility and enhance [its] highest and best uses." *State Dept. of Trans. v. Montgomery Ward Dev.*, 79 Or App 457, 464, 719 P2d 507, *rev den* 301 Or 667 (1986). Their value may be used to offset the damages to the remainder of the property after a condemnation occurs, but it cannot be used to adversely

---

[2] The verdict form returned by the jury did not require it to reveal its method of calculation or to indicate its findings regarding whether there was a special benefit to the retained land rendered by the condemnation.

affect the right of the owner of the property to receive the fair market value of the land taken for public use. *State Highway Com. v. Bailey et al.*, 212 Or 261, 319 P2d 906 (1957). In *Bailey*, the Highway Commission condemned the defendants' farmland for use along a highway. The trial court struck the Highway Commission's pleading that alleged that, although the taking would devalue the property in certain ways, there would be special benefits to the property. The commission's pleading alleged the monetary value of the special benefits that would be conferred on the condemned lands. The court first determined that the improvements about which the Highway Commission wanted to offer evidence were in fact "special" benefits accruing only to the affected landowners, rather than general benefits to the region as a whole.

■      The court then undertook to describe the kind of evidence that is admissible on the issue of special benefits.[3] It explained:

> "We have held that it is unnecessary for the jury to make special findings as to the amounts of damages and benefits. To require such separate findings would unduly complicate the task of a lay jury whose only duty is to determine (1) the value of the land taken and (2) the depreciation in value of the residue." *Bailey*, 212 Or at 283.

The court also said:

> "The evidence taken at the trial on the merits is not before us. Without a view of the premises and evidence concerning the lay of the land, it would be impossible to know to what extent if any the reserved rights do or could benefit any of the parcels. We merely hold that plaintiff Commission was entitled to present evidence of circumstances tending to show what if any special benefits accrue to the four parcels by reason of the access and crossing rights reserved to the defendants and *what if any effect said reservations had upon the market value of the land not taken.*
>
> "* * * * *
>
> "By way of summary we see that evidence will be admissible in behalf of the defendants to show 'the manner,

---

[3] The court did not have an evidentiary record before it.

nature and extent' of the taking for a limited access highway, the separation of defendants' land into different tracts and the added inconvenience, if any, in going about and managing the property, and similar circumstances so far as they cause a depreciation in the fair market value of the land not taken, and defendants may show the extent of such depreciation. In like manner evidence will be admissible in behalf of the plaintiff Commission to show the beneficial effects, if any, of the rights of access and crossing which tend to minimize the damage, if any, which would accrue if the severance by a nonaccess highway were absolute and complete. The ultimate duty of the finder of the facts will be to consider all of this evidence in arriving at the net depreciation in value of the land not taken." *Bailey*, 212 Or at 287-89. (Emphasis added; citations omitted.)

Then, the court proceeded to consider whether, in light of the allegations, it was inferable that some special benefit had been conferred:

"We conclude that presumptively the proposed construction will result in some special benefits and that the existence and extent of such benefits are normally questions for the consideration of the jury upon all of the evidence and under proper instructions. It is only when the court can say as a matter of law that evidence offered to prove special benefits is so remote and speculative as to show no substantial basis for such a finding that the court can reject the evidence offered." *Id*. at 302.

The court added:

"[t]here also became established the rule which this and many other courts have adopted, namely, that the compensation to which the landowner is entitled is measured by the depreciation if any in the fair market value of the remainder of the land by reason of the taking. Once this rule is adopted the question for the jury becomes, what was the fair cash market value before the taking, and what was or will be that value after the taking? * * * Any competent evidence of matters not merely speculative which would be considered by a prospective vendor or purchaser or *which tend to enhance or depreciate the value of the property is admissible.* * * * We find no logical reason for requiring an expert witness on real estate values to exclude from consideration any substantial element, be it plus or minus, *which directly affects market value of the land* whether or not it

also affects the value of other lands." *Id.* at 303-04. (Emphasis added.)

It concluded:

"From the very nature of the nonaccess road which is proposed, the jury may consider what if any special benefits accrue to defendants' land with its rights of access, in view of the rarity of such rights as may appear from the evidence." *Id.* at 308.

ODOT argues, and we agree, that *Bailey* "established a general rule that evidence showing special benefits is broadly admissible," as long as it shows a direct effect on the fair market value of the land in question. We turn next to the court's subsequent opinion on "special benefits" in *Selbee v. Multnomah County*, 247 Or 390, 430 P2d 561 (1967). There, the landowner owned a residence along Southeast Foster Road, which was being widened by Multnomah County. As part of its project, the county took a strip of land 15 feet in width belonging to the landowner. At the trial to determine just compensation for the landowner, the court instructed the jury that it could consider special benefits to the retained parcel in calculating just compensation. The landowner excepted to the instruction on the ground that there was no evidence to support it, and the trial court eventually agreed, granting a new trial. The county appealed, relying on *Bailey*, and especially on the statement in *Bailey* that, "presumptively, the proposed construction will result in some special benefits and * * * the existence and extent of such special benefits are normally questions for the consideration of the jury." *Bailey*, 212 Or at 302.

In affirming the trial court, the Supreme Court explained:

"Concededly, the statement [in *Bailey*] was dictum, but assuming its correctness in the context of the case in which it is found—the construction of a highway through agricultural lands—it does not follow that the same thing would be true of a case such as the one before us. We think it is a matter of common knowledge that conversion of a two-lane road in a residential district into a four-lane highway, with its attendant increase in high-speed automobile traffic, may be a detriment rather than a benefit to adjacent property, and

bring about a lowering of its market value. \* \* \* It is possible that the particular features of the improvement, or some of them, to which the brief has called attention did constitute a special benefit to the remainder of plaintiff's property, but no witness testified that it did. \* \* \* The general rule is that, 'any alleged benefit, to have any standing in court at all, must be *genuine and capable of estimation in money value. It must add to the present fair market value* of the remaining land with reference to all the uses to which it is reasonably adapted, and for which it is available.' \* \* \* In order to enable the jury to pass intelligently upon the question of *whether the market value of the remaining land has been increased* as a result of the improvement, we think that, at least in the generality of cases, there *must be some evidence of that fact other than the improvement itself.*" *Selbee*, 247 Or at 393-94. (Emphasis added; footnote and citation omitted.)

Also, as part of establishing that compensation is "just," the Supreme Court has held in varying contexts that an award of compensation must be based on realistic, non-speculative, and nonremote evidence. *Re Petition of Reeder et al.*, 110 Or 484, 493, 222 P 724 (1924), *overruled in part by Bailey.* ("Remote or speculative benefits or damages should not be taken into consideration in any case, but such only as are reasonably certain."). *See also State Highway Comm. v. Compton*, 265 Or 339, 507 P2d 13 (1973); *State Dept. of Transportation v. Jeans*, 80 Or App 582, 723 P2d 344, *rev den* 302 Or 342 (1986). Other authorities echo that general rule. For instance, Julius Sackman, in 3 *Nichols on Eminent Domain*, 8A-45-46 (rev 3d ed 2000), states:

"A determination of the precise quantum and quality of evidence necessary to establish special benefits that may be offset is difficult. At the valuation trial the evidence of benefits is primarily in the form of expert appraisal opinion, and attempts are frequently made to express enhancement in a conclusory manner. However, the condemner must offer specific evidence of the amount of benefits before the issue can be submitted to the jury. A general statement that the property has been benefitted is insufficient. *The evidence must show the specific dollar amount of benefit, the percentage by which the value increased or a formula from which the jury can compute the amount of benefits.* Although most states require the jury to return only a lump

sum verdict, the evidence and the jury instructions must provide a basis to compute separately the value of the part taken, severance damages and benefits." (Emphasis added.)

The question becomes whether, in the words of *Selbee,* the evidence is sufficient under the circumstances *of this case* to permit "the jury to pass intelligently upon the question of whether the market value of the remaining land has been increased as a result of the improvement," without having to resort to speculation or guesswork. In that light, we examine the evidence of "special benefits" in the record. Fullerton testified that there was no benefit to the remaining property from the taking. He said that, because the property has only one remaining access route, traffic around it would increase, and that the paving and parking lot work would require just as much maintenance as the gravel driveway and garages that had previously existed. He testified that he did not believe that the improvements would justify an increase in the amount of rent and, consequently, that there were no special benefits to his remaining property as a result of the taking.

Gordon Davis, a self-employed project manager who has worked with various county and private property projects, also testified about the effect of the changes to the property. He said that the paved driveway was a "better structural section" than the prior driveway and had a better wear surface. He also testified that the paving of the driveway will create new problems, such as maintenance, sealing, repairs and drainage. He testified in the same manner regarding the new curbs, gutters, drains and sidewalks that were installed—that they were better structurally but that they would also cause new and different problems for the property owner. Davis was asked specifically, "For an investor who might want to buy an apartment complex in the future, if all [these improvements] are finished, is it better for the investor, general average investor?" Davis replied that the improved property might appeal more to an urban investor, while the unimproved property might have more appeal to a rural investor, and that "better" was in the "eye-of-the-beholder[.]"

Don Palmer, a real estate appraiser, also testified. Palmer was asked, in the context of whether there were damages to the retained land, about the loss of parking space and the cost of replacing the lost parking and landscaping. He testified that the Fullertons would be obligated, because of the consequences of the project to their property, to bring the entire remaining property up to local building code standards. He testified as to the cost of building a code-compliant parking lot and to the cost of landscaping. Then, in a separate line of questioning involving special benefits, Palmer was asked whether the improvements added to the convenience or accessibility of the subject property. He answered: "Do they add to the accessibility? I don't know if it really increases accessibility. They had good access off of Canyon Road before." He was asked about convenience, and replied, "I don't think there's any change * * * before and after." When asked specifically about whether "people like to have" curbs and sidewalks at their apartments, he replied, "I'm not sure that tenants rather care about what they walk on. It's what they pay for rent that really is important."

The ODOT assistant project manager, William Barnhart, also testified about the gravel driveway. He stated that he had seen the previous gravel driveway, that it was not necessarily smooth, but that it was not rough either, and that the gravel driveway would have needed more care than the paved driveway.

Finally, John Wooden, the ODOT appraiser testified. He testified that "basically, [there was] not a whole lot of change in the before versus the after condition in terms of rents." He also said:

> "The apartment units themselves, I left them the same. Again, the units weren't actually impacted by the property. They're not smaller, they're not bigger. They don't have new carpeting. There are changes. The size I reduced. There's a little less landscaping. On the other hand, they're paved parking and paved driveway and so on and so forth. In my mind that, more or less, balanced out."

He testified further:

> "Q. Do you consider these improvements that—would those improvements specially affect the remaining

property because of their location in relation to the project and do they add to the convenience or accessibility of the defendant's remaining property?

"A. Yes.

"Q. Now, in your analysis, because of the way you did it, did you put any particular dollar figure on how it specially benefits the property?

"A. No."

Wooden's testimony on this point construed on cross-examination, which immediately followed the above testimony.

"Q. Just to pick up on that last point, did these benefits that—I think that's a list of what its intended to be—did they have any affect upon increasing the rental income on the seven units?

"A. Taken as a whole, I looked at all of those elements and weighed them together and concluded no change in rent.

"Q. So even though the property has these features, there's not a nickel more [that] goes to the [owners] because of any of them?

"A. In the apartment rent?

"Q. In the apartment rent.

"A. No.

"Q. And let's see. The—your conclusion of value then contained no special benefits to the defendants' property by reason of any of these things?

"A. No quantified special benefits?

"Q. Yes.

"A. Yes.

"Q. And did you find at any time when you were investigating this property that there were any special benefits because of the roadway or because of the highway system or anything of that nature that—

"A. Not that I tried to quantify and put a dollar value on."

Our review of that evidence satisfies us that it does not provide a basis for a jury instruction on special benefits. Whether the test is whether the jury had sufficient facts to make an intelligent inquiry or whether the court's charge required it to speculate, the result is the same. No witness testified affirmatively that there were special benefits that added value to the property. The witness who came the closest was Wooden, who said that the improvements would add "convenience" or "accessibility" to the property. However, the inability of the witnesses to measure or calculate the amount of added benefit to the property from the improvement required the jury to speculate impermissibly on the fair market value of any special benefits or to rely on its own knowledge or on information outside the record.

■      Nonetheless, ODOT argues on appeal that the jury could have used Palmer's testimony in determining the value of special benefits. Specifically, it argues:

"The owners' appraiser, Donald Palmer, testified that after the project the highest and best use for the property, which presently consists of seven units, would be eight units. He also testified that before an owner could change the property—for example, by adding a unit—the owner would have to bring the entire property into compliance with current development code requirements for landscaping and paved parking. He testified that an owner wishing to meet the landscaping requirement would need to add 2500 to 3000 square feet of landscaping to the property, at a standard cost of $3 to $4 per square foot. He estimated the cost of a paved driveway at $60,000 while a state witness estimated that cost at $30,000. Palmer also testified that the project will bring the property into compliance with current development code landscaping and paved parking requirements. This provides evidence that, because of the project, potential purchasers wishing to put the property to its highest and best use might be able to do so without incurring significant landscaping and parking code compliance costs. This, in turn, could suggest that the property enhanced the property's value by all or part of the avoided costs, $7,500 to $12,000 for landscaping and $30,000 to $60,000 for paved parking."

Our consideration of that argument requires some further background. Where property can be restored to its

original condition after its value has been damaged, the measure of damages may, under some circumstances, be measured by the cost of restoration rather than the diminution in value. *Millers Mut. Fire Ins. Co. v. Wildish Const. Co.*, 306 Or 102, 758 P2d 836 (1988). In accordance with that understanding, the trial court in this case instructed the jury as follows:

> "Witnesses have testified about a cost to cure method [of] measuring the damages to the defendants' remaining real property. I instruct you that this testimony is proper for your consideration in this case. If you find from the evidence that a portion of the damages to defendants' remaining real property can be cured by corrective work, you may reduce the damages by the cost of that corrective work. If you find that all of the damages can be corrected, then you shall award nothing beyond whatever the cost to cure was."

Thus, evidence of the costs of restoration are an alternative way to measure the amount of damage to real property.

In contrast, the evidence of special benefits is evidence that adds to the value of the remaining property. It serves to reduce the total damages, if any, to the remaining property. Thus, here the trial court told the jury that,

> "[T]he plaintiff has presented evidence that the defendants' remaining property has been specially benefitted as a result of the relocation or reconstruction of Canyon Lane and the new access driveway. * * * [I]f you find from the evidence that the location and construction of the project adds to the convenience, accessibility, or use of all or a portion of the defendants' remaining property, or that the remaining properties had a higher and better use than it had prior to the taking, you may consider such special benefits to the extent that they reduce the total damages, if any, to the defendants' remaining property. However, special benefits may never be offset against the value of the property taken."

In the trial court, Palmer's testimony, on which ODOT relies on appeal, was elicited in the context of questioning about the restoration of the Fullertons' property to its original use. Palmer was asked about how much landscaping the Fullertons would have to do as a result of the project. He testified that the need for a parking lot, which was a direct

result of the taking of the garages, would trigger the requirement to comply with local building codes, a requirement from which the property had formerly been excused. His testimony about the cost of creating the parking lot and landscaping was an estimate of what the Fullertons would have to receive from the state in compensation in order for their property to be made whole after the taking. The following questioning resulted in the testimony on which ODOT relies:

"Q. And what other damages did you feel the Fullertons suffered?

"A. Parking lot. We've got to replace parking and you've seen plans between 12 and 14 spaces. And people wouldn't be spending a lot of time dealing with this parking unless somebody had to replace it. And parking, in order for these people now, when they replace that parking, are required to bring up the parking lot to the current codes. * * * That current code is paved, asphalt parking.

"* * * * *

"Q. And besides the cost of the parking lot, do you thing there's landscaping going to be required?

"A. There's some perimetry [sic] landscaping around the parking lot. Now we have landscaping along ODOT's slope easement, so that landscaping is going to be there, but there will be parking landscaping required around the parking lot.

"* * * * *

"Q. The parking lot is a damage based upon what?

"A. We worked with Mr. Davis who worked with SJO Engineering. And SJO Engineering did some schematics that you looked at yesterday, and those cost are from what SJO has provided—$60,440. And that's just for the parking, that's asphalt, curbs, everything to build the parking lot, but does not include landscaping.

"Q. And just to—when you say landscaping is required, what dictates that? Where is landscaping required?

"A. It's a development code. * * *

"Q.  It's triggered because they have to get a building permit for a parking lot?

"A.  That parking lot as a rule is an opportunity to ask a property owner to bring everything up. That's a fairly significant addition to a property. So I think that parking lot is going to trigger them being—having to do everything according to code."

During the discussion about the jury instructions, the court summarized the argument that it believed ODOT would be making to the jury. It said:

"So you would be saying, partly, 'Jury, Mr. Wooden and other witnesses told you that these are the things that are now next to this apartment building: a new curb, sidewalks, landscaping, a better road, et cetera, et cetera, et cetera. Mr. Wooden has told you if he chose to stay there that it's not going to increase the rents, but it's up to you to decide if it decreases the value to the Fullertons.' That's what your position would be?"

ODOT agreed that the court had accurately summarized its position. Then the court continued:

"And as far as I'm concerned, [ODOT] has passed this requirement, [which] is that somebody testify as to a benefit. That he was not going to get that instruction and get to argue it if nobody ever said that. And just because Mr. Fullerton doesn't agree with that, we do have an expert appraisal [Wooden] who, all he basically said is that, 'well, I don't know that we get increased rents so I'm putting down zero, but these are all benefits that I see as an appraiser.' And that, to me, is enough to go to the jury."

During closing argument, ODOT argued to the jury, in part, that

"[y]ou can reduce damages if you find that there are special benefits as a result of the project which enhance the convenience and accessibility and if we had at the highest and best use of the remainder property. And you'll remember that the remainder is what you see in this. The new street is in and we had plenty of people say sidewalks, curbs, gutters, new driveway, all of the landscaping. Irrigated landscaping was not there before. That is all a special benefit, as I see it.

It enhances the convenience and accessibility of that project, of that property, as a result of that project. It adds to the property.

"Now, I can see even our State's appraiser, the way he did his appraisal, looking primarily at income, looking to see what an investor would pay for the property, concluded, well, an investor, he thought, wouldn't pay more for the property because you had those special benefits, so he put zero on the number. Well, I think that's wrong, but that's his opinion and we hire him to give his opinion. Now, my opinion—and you could find that these special benefits actually have a value. I don't know what they are. Could it be a dollar a day per tenant in this complex? I mean, is it worthwhile to not have to walk in the mud or that sort of thing? Is it 50 cents a day, something like that, times seven tenants? If we just had one in each times 365 days, good for ten years? I don't know. That could be a number that would make some sense to me. But you—I would ask you, when you're in the jury room deliberating, consider the idea of those special benefits and giving the benefit to the State."

In light of the above record, we are persuaded that, under the court's instructions, Palmer's testimony on which ODOT relies was probative only on the issue of the cost of restoring the Fullertons' property to its original use and not on the issue of special benefits. ODOT does not cross-assign error to the definition of special benefits given by the trial court. Consequently, we assume, for purposes of this case, that the instruction was a correct statement of the law. Under the instructions, Palmer's cost of restoration testimony was irrelevant to the issue of special benefits. *See, e.g.*, *State v. Guzek*, 322 Or 245, 251-52, 906 P2d 272 (1995) (holding that pleadings, other evidence and jury instructions ultimately define the scope of relevant evidence). On that basis, ODOT's argument that Palmer's testimony supplies the missing evidence must fail.

As to ODOT's "harmless error" argument, we are not persuaded. As the court said in *Selbee*, there must be some evidence, other than the fact of the improvement itself, that demonstrates special benefits to reduce damage to the property not taken. 247 Or at 394. To adopt ODOT's approach would be to swallow that rule because presumably a condemning authority will often be able to demonstrate

improvements of this type as a predicate to requesting an off-set based on special benefits. The law, however, also requires a showing that the condemnee's remaining property has *increased* in value as the result of the improvements. We need not decide whether evidence of a specific dollar amount will always be necessary to submit a "special benefits" issue to a jury. Rather, we hold that, under the circumstances of this case, the evidence as a whole did not suffice to permit the jury to make a calculation of special benefits, if any, with reasonable certainty. Consequently, a new trial is required.

Reversed and remanded for new trial.